**Charline PACOUREK, Plaintiff,**

v.

**INLAND STEEL COMPANY, Defendant.**

**No. 94 C 0130.**

United States District Court, N.D. Illinois, Eastern Division.

July 27, 1994.

James P. Nagle, Querrey & Harrow, Ltd., Wheaton, IL, David H. Ortiz, David H. Ortiz & Associates, Chicago, IL, for plaintiff.

Thomas G. Abram, Lawrence L. Summers, Paula Kay Bebensee, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

This case is before the court on the motion of defendants Inland Steel Co. ("Inland Steel"), Alex Monanteras and Thomas Wides[1] to dismiss the Second Amended Complaint ("Complaint") for failure to state a claim upon which relief can be granted. FED. R.CIV.P. 12(b)(6).

### I. BACKGROUND

Plaintiff Charline[2] Pacourek charges defendants Inland Steel; Alex Monanteras, a manager at Inland Steel; Thomas Wides, Section Manager at Inland Steel; and Paul J. Austgen, Credit Manager at Inland Steel, with four different violations of federal employment discrimination law. Count I charges a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. Count II charges a violation of the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k), an amendment to Title VII. Count III alleges a violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq. Count IV charges a violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq. The factual background herein and the resolution of the pending Rule 12(b)(6) motion rely upon the allegations in the Second Amended Complaint.[3] See Conley v. Gibson, 355 U.S.

41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Inland Steel hired plaintiff Charline Pacourek into its Employee Benefits Department on March 4, 1975. Inland Steel transferred her on September 15, 1975, to the Profitability Accounting Department as a cost and inventory clerk. In December 1980, plaintiff was promoted to "Senior Price Computer" in the Invoice Pricing Department. The Complaint notes no other formal change in plaintiff's employment status until her termination June 11, 1993.

In October 1986, plaintiff was diagnosed with esphofical reflux, a medical condition that prevented her from becoming pregnant naturally. Subsequent to that time, plaintiff began an experimental course of treatment at the University of Chicago in an effort to become pregnant. Plaintiff alleges that she and the university expended much money and time on the treatment because plaintiff was the university's first in-vitro—fertilization patient. Sometime after October 1986, plaintiff notified Inland Steel of her efforts to become pregnant through the experimental treatment. After that time, plaintiff and Inland Steel communicated a number of times about plaintiff's employment status (described in more detail below), ultimately leading to her termination June 11, 1993.

Count I, the straightforward Title VII sex-discrimination count, alleges that defendants terminated plaintiff and replaced her with a male employee. Plaintiff alleges that the discrimination was pursuant to a "de facto policy, practice, custom or usage of discrimination against the Plaintiffs [sic] because of her sex." (Complaint at 4, ¶ 25.)

---

1. Paul J. Austgen is another defendant in this case, but no appearance has been filed on his behalf as of the date of this order, and he has not filed his own motion. The court herein refers to "defendants," sometimes meaning the moving defendants and sometimes meaning all defendants. Where context does not supply clarification, the court will.

2. On the face of the Complaint, Ms. Pacourek's first name is spelled "Charlene." However, she appears to spell her name "Charline," based upon her signature on exhibits.

3. The court assumes plaintiff meant to incorporate the exhibits from the First Amended Complaint into the Second Amended Complaint by reference, since the Second Amended Complaint refers to exhibits, but there are none attached. The court therefore will refer to exhibits to the First Amended Complaint as the exhibits to the current Second Amended Complaint. In their briefs, defendants operate under this assumption as well.

Count II invokes the PDA, claiming defendants terminated plaintiff because of esphofical reflux, a pregnancy-related condition. Furthermore, the count alleges that defendants discriminated against plaintiff and disparately applied a sick leave policy to plaintiff's detriment. Plaintiff further alleges that defendant Thomas Wides "verbally abused Plaintiff concerning her pregnancy related condition by expressing doubt as to her ability to become pregnant and her ability to combine pregnancy and her career." (*Id.* at 5, ¶ 34.)

Count II also describes some details of plaintiff's employment relationship with Inland Steel between October 1986 and June 1993. She alleges that on February 12, 1992, Wides informed plaintiff that her esphofical reflux was "'a problem.'" Wides then "handed Plaintiff a memo which placed her on probation." (*Id.* at 6, ¶ 35.) In March 1992 plaintiff explained the February 12 incident to Bill Lowry, Inland Steel's Personnel Director. Lowry informed plaintiff that "a letter from her treating physician would alleviate any problems." (*Id.* ¶ 36.) Plaintiff provided such a letter dated July 30, 1992, addressed to Richard Heiden at Inland Steel. (Complaint Ex. B.) In March 1992 Wides informed plaintiff that she was considered a "'High Risk' and that it was inevitable that she would be terminated." (Complaint at 6, ¶ 37.) Plaintiff submitted a memorandum to her personnel file regarding these events on November 23, 1992 (attached as Complaint Ex. C).

Count III alleges age discrimination in violation of the ADEA, claiming that plaintiff, over 40 years old, was replaced by a younger person despite her being qualified and satisfactorily performing her duties. Again, plaintiff alleges the behavior was pursuant to "a de facto policy, practice, custom or usage of discrimination." (Complaint at 7, ¶ 50.)

Finally, Count IV alleges a violation of the ADA. Plaintiff claims that her condition, esphofical reflux, is a physical impairment substantially limiting reproduction, a major life activity. Plaintiff claims defendants terminated her, discriminated against her, and disparately applied the company's sick leave policy to her detriment because of her condition.

Plaintiff seeks various legal and equitable remedies, which need not be discussed here, as they are not relevant to resolution of this motion.

Defendants now present five separate arguments for dismissal, in whole or in part, of plaintiff's Second Amended Complaint: (1) plaintiff failed to file a timely charge with the EEOC, barring her claims under Title VII, the ADA, and the ADEA; (2) Count II fails to state a claim for discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions" within the meaning of the PDA; (3) Count IV fails to state an ADA claim because her condition is not a "disability" covered by the ADA; (4) defendants Monanteras and Wides are not subject to suit as supervisors under Title VII, the ADA, or the ADEA; (5) plaintiff has not pleaded state action to present a claim under 42 U.S.C. § 1983.[4]

## II. STATUTE OF LIMITATIONS ON FILING OF EEOC CHARGE

### A. Statutes of Limitations in Federal Employment Discrimination Law

Plaintiff and defendants are in agreement as to the relevant administrative statute of limitations in this case: Title VII, which governs Counts I and II of the Complaint, requires that, as a prerequisite to a subsequent lawsuit, a claimant must file a charge of discrimination with the EEOC "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). Under the ADA, governing Count III of the Complaint, a charge similarly must be filed with the EEOC "within 300 days after the alleged unlawful practice occurred." 29 U.S.C. § 626(d)(2). Finally, the ADA, controlling Count IV, adopts the Title VII procedures for filing a charge

---

4. The second paragraph of the Complaint states that plaintiff "seeks further redress pursuant to 42 U.S.C. § 1983 for the deprivation of Plaintiff's rights." (Complaint at 1, ¶ 2.) The Complaint never, however, separately makes out such a section 1983 claim, and there is no count that proposes a section 1983 claim for relief.

and enforcing one's statutory rights, thus imposing the 300–day limitation as well. *See* 42 U.S.C. § 12117(a); *see also Kent v. Director, Missouri Dep't of Elementary & Secondary Educ. & Division of Vocational Rehabilitation*, 792 F.Supp. 59, 62 (E.D.Mo. 1992).

■ Perhaps for the sake of clearer argument, defendants have actually invoked the longer of the two relevant administrative statutes of limitations. The shorter period, and the one plaintiff invoked in her Complaint (Complaint at 2, ¶ 4), is 180 days. The 300–day limitations period applies where plaintiff has initially filed a charge "with a State or local agency with authority to grant or seek relief from such practice." 42 U.S.C. § 2000e–5(e)(1); *see also Gilardi v. Schroeder*, 833 F.2d 1226, 1230 (7th Cir.1987). There are two requirements: (1) that the state be such a so-called "deferral" state; and (2) that the plaintiff have actually filed such a state charge. *Gilardi*, 833 F.2d at 1230. Illinois, plaintiff's state of residence and the state in which the alleged wrongdoing occurred, is such a deferral state. *Id.* (citing ILL.REV.STAT. ch. 68, § 7–101 (now codified at 775 ILCS 5/7–101)); *see also* 29 C.F.R. § 1601.80 (listing Illinois Department of Human Rights as a certified state agency). However, there is no indication that plaintiff utilized state avenues. Indeed, in the Complaint plaintiff pleads only that she filed a charge directly with the EEOC, and accordingly invokes the 180–day statute of limitations.

Ultimately, defendants' concession is not damaging, which presumably prompted the concession in the first place. If, as is defendants' theory, plaintiff missed the 300–day limit, she would have missed the 180–day limit. The concession would only be damaging if plaintiff's claimed accrual date was between the 180–day and 300–day point, counting back from July 9, 1993, the date she filed her EEOC charge. However, as is discussed below, plaintiff's claimed accrual date for purposes of this motion is May 21, 1993.

### B. *Resolution of Limitations Issue*

■ As alleged in the Complaint, "[i]n March of 1992 Defendant Thomas Wides informed Plaintiff that she was considered a 'High Risk' and that it was inevitable that she would be terminated." (Complaint at 6, ¶ 37.) Defendants argue that the limitations period accrued in March 1992, and that therefore the July 9, 1993, filing of the EEOC charge was more than 300 days after the point of accrual. Plaintiff contends instead that she was not notified of her termination until the May 21, 1993, letter, informing her that her last day of work would be June 11. (Complaint Ex. D.) Plaintiff attempts to explain away the intervening warning signals as follows:

> While Plaintiff was placed in a high risk category in March of 1992, she was [not] terminated until June 1, 1993 [sic]. In the month of March 1992 Plaintiff was also assured by Personnel Director Bill Lowry of Inland Steel that a letter from her treating physician would alleviate any problems.... While plaintiff was continually threatened [s]he was made officially aware that she would be terminated when she received official notice that her las[t] day of employment would be June 11, 199[3]. Indeed the [May 21, 1993] letter indicated that a plant wide search for a suitable position has been ongoing. Thus this indicated that a final determination of Plaintiff's dismissal on June 11, 1993 was not reached until the date of the letter May 21, 1993.

(Memorandum of Law in Support of Plaintiff's Response to Defendant's [sic] Motion to Dismiss Second Amended Complaint at 2.)

■ The statute of limitations in federal employment law accrues "at the time the [adverse employment] decision was made and communicated" to the employee. *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980); *see also Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir.1990). What date the decision was made and communicated is a question of fact. *Lever v. Northwestern Univ.*, 979 F.2d 552, 553 (7th Cir.1992). Indeed, all the favorable Seventh Circuit cases defendants cite were ruling upon a factual

record of one sort or another, either after a hearing or on a summary judgment motion. *See Lever v. Northwestern Univ.,* 979 F.2d 552 (affirming factual findings after hearing); *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446 (affirming summary judgment); *Mull v. ARCO Durethene Plastics, Inc.,* 784 F.2d 284 (7th Cir.1986) (affirming summary judgment).

■ Here there is only the Complaint, not a factual record, and the task is to determine whether plaintiff has pleaded herself out of court by "plead[ing] facts that show that [her] suit is time-barred." *Tregenza v. Great Am. Communications Co.,* 12 F.3d 717, 718 (7th Cir.1993); *see also Early v. Bankers Life & Casualty Co.,* 959 F.2d 75, 79 (7th Cir.1992). The court holds that plaintiff has not pleaded herself out of court; in other words, it does not follow inevitably from the Complaint that under *Ricks* plaintiff's claims are time-barred.

■ Breaking things down a bit, there are two things the court would have to find about March 1992—when "Defendant Thomas Wides informed Plaintiff that she was considered a 'High Risk' and that it was inevitable that she would be terminated"—in order to hold that the statute of limitations bars plaintiff's claims. First, the court would need to find that March 1992 was the date that plaintiff's employer took the adverse employment action, as distinguished from the day that "the handwriting [was] on the wall." *Cada,* 920 F.2d at 449. The court cannot make such a finding on this motion to dismiss, in which the court takes all well-pleaded allegations as true, grants plaintiff the benefit of all reasonable inferences, and must deny the motion unless under no circumstances can plaintiff state a claim upon which relief may be granted. *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985). It could be reasonably inferred that by describing her termination as "inevitable" Wides meant something less than that the adverse employment decision was actually made. Inevitable could mean that is the way things are going,

not that it has been decided (an admittedly subtle distinction). The court cannot conclude here that under no circumstances could plaintiff prove a set of facts under the Complaint entitling her to relief. If the court did not give this reading to paragraph 37 of the Complaint, then one would be hard-pressed to make sense of the allegation that Wides told plaintiff she was "High Risk" at the same time he told her it was "inevitable" she would be terminated. If it was as inevitable as it would have to be in order to be the equivalent of firing, "High Risk" would be an understatement. Additionally, the crucial fact of Wides having the authority to accomplish the adverse employment decision is not pleaded, and so it does not inevitably follow from the Complaint that the allegation of Wides's communication to plaintiff constituted the adverse employment decision, or that he was communicating an adverse employment decision.[5] *See Cada,* 920 F.2d at 449–50.

The second thing the court would need to find about Wides's communication to plaintiff in March 1992 is that it was a communication to plaintiff of the adverse employment decision. In other words, even if the Complaint states that the adverse employment decision had been made (which above the court does not find), the court would still need to find that this decision was communicated to plaintiff, a distinction emphasized by the Seventh Circuit in *Cada,* 920 F.2d at 449–50. This, unlike the fact of the decision, would seem to follow from the allegation that Wides "informed" plaintiff. However, the first prong of the *Ricks* test having gone plaintiff's way, dismissal on statute of limitations grounds is not warranted.

In short, the theory defendants propose on statute of limitations is ultimately fact-based, and therefore since plaintiff's having missed the limitations deadline does not follow inevitably from the Complaint, statute of limita-

---

**5.** Of course, Wides could have been merely communicating a previous adverse employment decision made by an actor with authority to make it. That fact scenario, however, does not follow inevitably from the Complaint, and so it cannot be the basis of a motion to dismiss for failure to state a claim.

tions is not here a valid basis for dismissal for failure to state a claim.[6]

## III. FAILURE TO STATE A CLAIM UNDER THE PDA

### A. Background Law and Framing of the Legal Question

■ Plaintiff brings Count II pursuant to the Pregnancy Discrimination Act, a 1978 amendment to Title VII. The PDA provides:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e–2(h) of this title [specified authorized employment practices] shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: Provided, That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

42 U.S.C. § 2000e(k). The PDA was enacted in large part in response to the Supreme Court's decision in General Electric Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). See, e.g., H.R.Rep. No. 95–948, 95th Cong., 2d Sess. 2–4, reprinted in 1978 U.S.C.C.A.N. 4749, 4750–52. In Gilbert, the Court reversed a judgment for employees who challenged their employer's disability plan as discriminatory for its denial of benefits for disabilities arising out of pregnancy. The Gilbert court held:

> For all that appears, pregnancy-related disabilities constitute an additional risk, unique to women, and the failure to com-

pensate them for this risk does not destroy the presumed parity of the benefits, accruing to men and women alike, which results from the facially evenhanded inclusion of risks. To hold otherwise would endanger the commonsense notion that an employer who has no disability benefits program at all does not violate Title VII even though the "underinclusion" of risks impacts, as a result of pregnancy-related disabilities, more heavily upon one gender than upon the other. Just as there is no facial gender-based discrimination in that case, so, too, there is none here.

Gilbert, 429 U.S. at 139–40, 97 S.Ct. at 410 (footnote omitted).

■ The basic command of the PDA is the same neutrality towards pregnancy, childbirth, and related medical conditions as is expected under ordinary Title VII principles regarding the sex of the employee. "The Pregnancy Discrimination Act requires the employer to ignore an employee's pregnancy, but ... not her absence from work, unless the employer overlooks the comparable absences of nonpregnant employees ... in which event it would not be ignoring pregnancy after all." Troupe v. May Dep't Stores Co., 20 F.3d 734, 738 (7th Cir.1994); see also EEOC, Guidelines on Discrimination Because of Sex, Questions and Answers on the Pregnancy Discrimination Act ("EEOC Questions and Answers"), 29 C.F.R. § 1604 app. at 200 ("The basic principle of the Act is that women affected by pregnancy and related conditions must be treated the same as other applicants and employees on the basis of their ability or inability to work."). The PDA therefore does not affirmatively instruct employers to treat pregnancy, childbirth, or related medical conditions in any particular way; rather, it instructs employers to treat those things in a neutral way.

Plaintiff claims that in October 1986 she was diagnosed with esphofical reflux, "a medical condition which prevented her from becoming pregnant naturally." Subsequent to that time, she began experimental treatment for her condition, about which she notified

---

**6.** All of this, of course, leaves aside the question of whether, even if plaintiff's suit was filed beyond the time limit, an equitable principle would save her claims. See generally Cada, 920 F.2d 446.

her employer. She claims that defendants terminated her because of her "pregnancy related condition." Plaintiff further claims defendant Monanteras "engaged in disparate treatment of Plaintiff [by] attempting to apply a sick leave policy to Plaintiff due to her pregnancy related condition, while the same sick leave policy was not applied to other employees of Inland Steel." Furthermore, defendant Wides "verbally abused Plaintiff concerning her pregnancy related condition by expressing his doubt at her ability to become pregnant and her ability to combine pregnancy and her career." Finally, Wides informed plaintiff that her condition was "'a problem,'" handing her a memorandum that placed her on probation. Meeting with plaintiff, personnel director Bill Lowry told her that a letter from her treating physician would solve any problems. Plaintiff attaches to her Complaint a physician's letter regarding her treatment. (Complaint at 5–6 & Ex. B.)

Defendants make two arguments for dismissal. First, defendants argue that "Plaintiff has pleaded that she is unable to become pregnant naturally, and the Pregnancy Discrimination Act simply does not apply." Their position is that "inability to become pregnant" is not a covered condition. Defendants' second argument is that infertility is a gender-neutral condition, since it affects both men and women. Plaintiff has not shown, therefore, that her "status is uniquely female," and consequently deserving of the protection of the PDA. (Memorandum of Law in Support of Defendants' Motion to Dismiss Second Amended Complaint ("Defendants' Memorandum") at 5.)

### B. *Coverage of Plaintiff's Claim Under the PDA*

### 1. *Discrimination Based on Potential or Intended Pregnancy*

██ The parties cast the conflict here as merely over whether plaintiff's medical inability to become pregnant is a medical condition related to pregnancy for purposes of the PDA. There is a first level of analysis, however: whether discriminating against employees based on intended or potential pregnancy is covered by the PDA. The court

holds such a classification based on potential or intended pregnancy is covered.

██ By enacting the PDA, Congress repudiated not just the holding of the *Gilbert* decision, but the theory as well. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 678, 103 S.Ct. 2622, 2628, 77 L.Ed.2d 89 (1983). The basic theory of the PDA may be simply stated: Only women can become pregnant; stereotypes based on pregnancy and related medical conditions have been a barrier to women's economic advancement; and classifications based on pregnancy and related medical conditions are never gender-neutral. Discrimination against an employee because she intends to, is trying to, or simply has the potential to become pregnant is therefore illegal discrimination. It makes sense to conclude that the PDA was intended to cover a woman's intention or potential to become pregnant, because all that conclusion means is that discrimination against persons who intend to or can potentially become pregnant is discrimination against women, which is the kind of truism the PDA wrote into law.

The conclusion that the PDA covers potential or intended pregnancy is also supported by language in the Supreme Court's decision in *International Union, UAW v. Johnson Controls, Inc.,* 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991), holding an industrial fetal protection policy singling out women violates Title VII. True, as defendants argue, the *Johnson Controls* decision is not directly applicable to this case. In *Johnson Controls,* the Court cast its discussion of an employer's fetal protection policy primarily as one of "sex-plus" discrimination—discrimination based upon applying a requirement to one sex but not the other: "The bias in *Johnson Controls'* policy is obvious. Fertile men, but not fertile women, are given a choice as to whether they wish to risk their reproductive health for a particular job." *Johnson Controls,* 499 U.S. at 197, 111 S.Ct. at 1202. However, the Court's conclusion was "bolstered" by the PDA. The Court remarked that the employment policy under consideration "classifie[d] on the basis of potential for pregnancy." The Court continued, "Under the PDA, such a classification

must be regarded, for Title VII purposes, in the same light as explicit sex discrimination." *Id.* at 198, 111 S.Ct. at 1203.

Finally, while this court's holding rests upon a common-sense reading of the PDA's language and guidance from *Johnson Controls,* for those jurists and litigants who take comfort in supportive legislative history, there is some to be found. Senator Harrison Williams, chief sponsor of the Senate bill leading to the PDA, stated in floor debate that "[b]ecause of their *capacity to become pregnant,* women have been viewed as marginal workers not deserving the full benefits of compensation and advancement.... In some of these cases, the employer refused to consider women for particular types of jobs on the grounds that they *might become pregnant."* 123 Cong.Rec. 29385 (1977), *reprinted in* LEGISLATIVE HISTORY OF THE PREGNANCY DISCRIMINATION ACT OF 1978 ("LEGISLATIVE HISTORY") at 61 (emphases added). Senator Williams continued, "[T]he overall effect of discrimination against women because they *might become pregnant,* or do become pregnant, is to relegate women in general, and pregnant women in particular, to a second-class status...." *Id., reprinted in* LEGISLATIVE HISTORY at 62 (emphasis added). Representative Ronald Sarasin, a House bill manager, expressed a similar sentiment when he remarked that the PDA gives a woman "the right ... to be financially and legally protected *before,* during, and after her pregnancy." 124 Cong.Rec. 38574 (1978), *reprinted in* LEGISLATIVE HISTORY at 208 (emphasis added). Furthermore, the overwhelming expression of Congress's intent to repudiate the *Gilbert* opinion's underpinnings (recognized by the Supreme Court in *Newport News* ) provides a measure of direction regarding congressional intent in this case. *Gilbert* having been repudiated, this court could not credibly hold that potential or intended pregnancy is not a status protected from discrimination by Title VII.

Plaintiff's Complaint alleges that she was chided for her efforts to become pregnant, that her ability to combine pregnancy and a career were specifically doubted, that a leave policy was disparately applied against her, and that she was discriminated against be-

cause of her attempts to become pregnant. Plaintiff has alleged that she was adversely treated because of her potential or intended pregnancy, and that states a claim under the PDA.

### 2. *Plaintiff's Condition as a Pregnancy-related Medical Condition*

■ Plaintiff's Complaint, however, also alleges discrimination based upon her medical condition, which, as described in the Complaint, prevented her from becoming pregnant naturally. Defendants' motion presents the issue of whether a medical condition that prevents a woman from becoming pregnant naturally is a pregnancy-related medical condition for purposes of the PDA. To hold, as the court held above, that it is illegal under the PDA to discriminate on the basis of potential or intended pregnancy, is not necessarily to hold that plaintiff's condition is related to pregnancy for purposes of the PDA.

In deciding that novel issue of law, the court begins by noting the "well settled canon of statutory construction that remedial statutes, such as civil rights laws, are to be broadly construed." *Stoner v. Department of Agriculture,* 846 F.Supp. 738, 742 (W.D.Wis.1994) (citing NORMAN J. SINGER, SUTHERLAND, STATUTORY CONSTRUCTION § 60.01 (5th ed. 1992)). But the court need not rely on general interpretive rules to conclude that the PDA is to be applied broadly; there are such indications closer to the PDA. First and foremost, the language is expansive, covering "pregnancy, childbirth, or related medical conditions." "Related" is a generous choice of wording, suggesting that interpretation should favor inclusion rather than exclusion in the close cases. Furthermore, there is at least one indication in the PDA's legislative history that such a liberal construction is proper: "In using the broad phrase 'women affected by pregnancy, childbirth and related medical conditions,' the bill makes clear that its protection extends to the whole range of matters concerning the childbearing process." H.R.REP. No. 95–948, 95th Cong., 2d Sess. 5, *reprinted in* 5 U.S.C.C.A.N. 4749, 4753 (1978).

The court can find no reason—not in the cases, not in the legislative history, and, most significantly, not in the plain meaning of the

words of the statute—to exclude plaintiff's medical condition from the protection of the PDA. As a general matter, a woman's medical condition rendering her unable to become pregnant naturally is a medical condition related to pregnancy and childbirth for purposes of the Pregnancy Discrimination Act.

The first and best reason for this conclusion is that it follows naturally from the statutory language, the ordinary meaning of which is the best indication of legislative purpose. *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). In ordinary terms, a medical condition related to the ability of a woman to have a child is related to pregnancy and childbirth. Defendants would have the court dodge the most natural reading of the words of the statute to avoid a result defendants view as a "stretch[ ]." (Defendants' Memorandum at 5.) On the contrary, the court's holding is not a stretch because all the holding means is that employers are to treat a woman's medical infertility with neutrality—the same general command of the PDA regarding pregnancy itself. *See Troupe,* 20 F.3d at 738. The court therefore does not hold that the PDA affirmatively instructs employers to treat a woman's medical infertility any way in particular, beyond the command that employers treat her medical infertility neutrally.

This court's conclusion is also supported by the language on the PDA in the Supreme Court's *Johnson Controls* decision. The *Johnson Controls* Court, as explained above, condemned as illegal under the PDA an employer's having "classifie[d] on the basis of potential for pregnancy." The Court then explained, "Under the PDA, such a classification must be regarded, for Title VII purposes, in the same light as explicit sex discrimination." *Johnson Controls,* 499 U.S. at 198, 111 S.Ct. at 1203. If potential pregnancy is treated like pregnancy for purposes of the PDA, it follows that potential-pregnancy—related medical conditions should be treated like pregnancy-related medical conditions for purposes of the PDA.

Furthermore, there is authority for application of the PDA to a woman's choice to have an abortion. EEOC guidance states that "[a]n employer cannot discriminate in its employment practices against a woman who has had an abortion." EEOC Questions and Answers, 29 C.F.R. § 1604 app. at 204; *see also Doe v. First Nat'l Bank of Chicago,* 668 F.Supp. 1110 (N.D.Ill.1987) (strongly suggesting abortion discrimination is covered by the PDA, but avoiding a holding to that effect as unnecessary); *Turic v. Holland Hospitality, Inc.,* 849 F.Supp. 544, 549 (W.D.Mich.1994) ("I interpret the PDA's use of the term 'related medical conditions' to encompass a woman's constitutional right to have an abortion."). If the coverage of the PDA is thought of in concentric circles, discrimination based on the fact of being pregnant might be thought of as the core wrong that the PDA was meant to address, or the inner-most concentric circle. The next concentric circle might contain the abortion decision. The court can find no reason why the same circle that contains termination of a pregnancy would not also include the initiation of a pregnancy.

Lastly, the court does not find persuasive defendants' argument that, since both men and women cannot become pregnant, infertility is a gender-neutral condition. The argument's basis is that the apparent goal of the PDA was to eliminate seemingly neutral classifications that in fact burdened women. In the PDA Congress made clear that to "neutrally" discriminate against employees on the basis of pregnancy, childbirth, or related medical conditions was not neutral at all. If the classification defendants adopted does not violate that neutrality principle, the argument goes, it does not violate the PDA. Ultimately, however, this argument does not justify dismissal of the PDA count.

One reason this argument does not ultimately prevail is that it is reliant upon hypothetical fact situations outside of the Complaint. If it is defendants' contention that their policy was one of gender-neutral discrimination against infertile workers, then the issues such a policy raises would be before the court. For now, however, those issues are not. Therefore the court is hesitant to proceed any further than the immediate conclusions from its reading of the PDA: Plaintiff's condition as described is a medical condition related to pregnancy; discrimina-

tion based on a pregnancy-related medical condition is discrimination because of sex; therefore plaintiff's allegations of discrimination based on her medical condition state a claim.

Another reason the court does not dismiss Count II on the gender-neutrality argument is its reading of EEOC guidance on an analogous question. In the EEOC's "Questions and Answers on the Pregnancy Discrimination Act," the agency raises the question, "If an employer has an all female workforce or job classification, must benefits be provided for pregnancy-related conditions?" The EEOC answers "Yes. If benefits are provided for other conditions, they must also be provided for pregnancy-related conditions." EEOC Questions and Answers, 29 C.F.R. § 1604 app. at 202. What the court takes from this guidance is that once it is determined that a classification is in contravention of the PDA, that classification is not to be further tested for gender neutrality with an eye toward approving the classification·if it is found to be gender neutral in its specific context.

The court finds plaintiff has stated a claim in Count II under the PDA.

## IV. *FAILURE TO STATE A CLAIM UNDER THE ADA*

Plaintiff brings Count IV under the Americans with Disabilities Act, claiming that defendants discriminated against her on the basis of "a physical impairment that substantially limits one of [her] major life activities—reproduction." (Complaint at 9, ¶ 53.) The alleged impairment is plaintiff's condition of esphofical reflux, which, as described in the Complaint, prevents plaintiff from becoming pregnant naturally.

Defendants argue that plaintiff's condition is not a covered disability under the ADA. The ADA's relevant definition of "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A). Thus, there are three components to the definition that should be broken down for clarity: (1) whether plaintiff's condition is a physical or mental impairment; (2) whether that impairment affects major life activity;

and (3) whether the major life activity is substantially limited by the impairment.

### A. *Physical or Mental Impairment*

 Plaintiff's condition, as described in the Complaint, prevents her from becoming pregnant naturally. The EEOC regulations include such a condition in their definition of covered impairment. The EEOC instructs that "physical or mental impairment" is "[a]ny physiological disorder ... or condition" affecting one or more of a number of listed "body systems." Specifically listed among the body systems is the "reproductive" system. EEOC, Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act, 29 C.F.R. § 1630.2(h)(1). The Seventh Circuit has applied the same regulation to·a similar question, although in a case where the point was not disputed by the employer. *McWright v. Alexander*, 982 F.2d 222, 226–27 (7th Cir.1992) (interpreting substantially identical Rehabilitation Act regulations).

This guiding authority points to the conclusion that plaintiff has pleaded a claim that her condition is a covered physical or mental impairment. Defendants do not dispute this point, instead arguing that the impairment is not of a major life activity.

### B. *Major Life Activity*

 For two reasons, the court holds that reproduction can be a covered major life activity under the ADA. First, while the EEOC regulation cited above only instructs that the reproductive system can be the subject of *impairment*, it logically follows from that instruction that reproduction is a covered major life activity. Otherwise, it would have made no sense to include the reproductive system among the systems that can have an ADA physical impairment. Second, the *McWright* court's statement, while arguably dicta because of the aforementioned concession by the employer in that case, at least guides the court. As noted above, the Seventh Circuit in that case remarked that the Rehabilitation Act "regulations define the protected class of handicapped individuals to include any person with a physiological disor-

der affecting the reproductive system." *McWright*, 982 F.2d at 226–27. The Rehabilitation Act regulations' definition of "handicapped" and the ADA and ADA regulations' definition of "disability" are substantially identical, making *McWright* applicable to this ADA case. *See* EEOC, Equal Employment Opportunity in the Federal Government, 29 C.F.R. § 1613.702.

### C. *Substantially Limits*

■ The last element of the definition is substantial limitation of the major life function. Once reproduction is categorized as a major life activity, the conclusion that infertility substantially limits the major life activity is a matter of common sense. The regulations state that "substantially limits" means rendering one either "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.-2(j). Plaintiff's allegations clearly state a claim within that definition.

The court therefore views plaintiff as having pleaded that she has a disability covered under the ADA.

### V. *SUPERVISOR LIABILITY*

■ Monanteras, Wides and Austgen, managers for the corporate defendant, are named as defendants in this case. Defendants Monanteras and Wides raise the issue, undecided in this circuit, of whether a supervisor of an employee may be liable for violations of Title VII, the ADA, and the ADEA. The circuit courts of appeals have split on this issue. *Compare, e.g., Grant v. Lone Star Co.*, 21 F.3d 649, 651–53 (5th Cir.1994) (no supervisor liability) *with Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir.1989) (supervisor liability). Furthermore, the courts of this district are similarly divided. *Compare Carlson v. Northwestern Univ.*, No. 93 C 5879, 1994 WL 130763, at *2–3 (N.D.Ill. Apr. 14, 1994) (Norgle, J.) (supervisors not

liable); *Pommier v. James L. Edelstein Enterprises*, 816 F.Supp. 476, 480–81 (N.D.Ill. 1993) (Aspen, J.) (same); *Weiss v. Coca–Cola Bottling Co. of Chicago*, 772 F.Supp. 407, 410–11 (N.D.Ill.1991) (Duff, J.) (same) *with Vakharia v. Swedish Covenant Hosp.*, 824 F.Supp. 769, 784–86 (N.D.Ill.1993) (Moran, C.J.) (supervisors liable). The court here sides with this district's majority and holds that a supervisor cannot be held liable for violations of Title VII, the ADA, or the ADEA.

Among the rationales for the court's conclusion as to Title VII and the ADA is the remedial structure of the statutes, which was a component of the reasoning of other courts that concur with this court. *See, e.g., Carlson*, 1994 WL 130763, at *3; *Pommier*, 816 F.Supp. at 481; *Weiss*, 772 F.Supp. at 411. As Judge Aspen remarked, "the remedies available under Title VII (prior to the 1991 amendment) are remedies which an employer, not an individual, would generally provide—*i.e.*, back-pay, reinstatement and other equitable relief if warranted." *Pommier*, 816 F.Supp. at 481 (citing *Weiss*, 772 F.Supp. at 411).

Judge Aspen's aside about the expanded remedies under the Civil Rights Act of 1991, 42 U.S.C. § 1981a(a)(1), points to an added element in the discussion here, since the 1991 Act applies, given plaintiff's alleged 1993 termination date. Judge Moran commented that where the 1991 Act applies, the remedial-structure argument "would lose virtually all of its force, since the 1991 amendments allow for full compensatory damages—not just back pay—as well as punitive damages." *Vakharia*, 824 F.Supp. at 785 n. 2. This court disagrees, however, with that interpretation of the revamped remedial structure of Title VII. The 1991 amendment providing for compensatory and punitive damages also sets caps on the available damages. 42 U.S.C. § 1981a(b)(3). Those caps are based solely on the number of employees that the respondent in the case has over a specified period of time. *Id.* A supervisor himself does not "have" employees in the sense the court reads the 1991 Act to mean, at least not without giving a tortured construction to the provision at issue. *Accord Miller*, 991 F.2d

at 588 n. 3. Therefore, the 1991 Act, like the original Title VII, structurally disfavors supervisor liability.

The ADA incorporates the remedial provisions of Title VII. 42 U.S.C. § 12117(a). Accordingly, the remedial-structure argument under Title VII applies equally to the ADA, and the court holds the supervisor defendants may not be liable under the ADA.

Turning to the ADEA, the analysis changes somewhat because the ADEA provides a plaintiff the additional remedy of liquidated damages in the case of a willful violation. 29 U.S.C. § 626(b). However, this distinction does not ultimately result in the imposition of supervisor liability. Courts applying the Title VII supervisor-liability restriction have also held as much regarding the ADEA. *See Miller,* 991 F.2d at 587–88; *Carlson,* 1994 WL 130763, at *2–3. Given the exclusion of small employers from liability under all three statutes, "in light of Congress' intent to restrict the liability of small entities with limited resources, it is doubtful that Congress intended to impose liability upon individual employees." *Carlson,* 1994 WL 130763, at *3. In fact, the small-employer restriction loses its basis once one includes supervisors as defendants, since individually targeted supervisors would not be more or less deserving of protection depending upon the size of the employer for whom they work. Therefore, while the remedial-structure argument does not apply as well to the ADEA as to Title VII and the ADA, there are separate indications that the correct interpretation of the ADEA is to exclude supervisors from liability.

Accordingly, defendants Monanteras, Wides and Austgen are dismissed as party defendants.[7]

### VI. *FAILURE TO STATE A SECTION 1983 CLAIM*

■ While plaintiff does not include a count brought under 42 U.S.C. § 1983 in her Complaint, she does mention section 1983 in an introductory paragraph. That paragraph states, "This action seeks further redress pursuant to 42 U.S.C. 1983, for the deprivation of Plaintiff's rights and privileges as secured by the ... First Amendment and Fourteenth Amendment ... of the United State[s] Constitution." (Complaint at 1–2, ¶ 2.)

This paragraph does not survive defendants' motion. The defendants as described in the Complaint clearly have not acted "under color of state law," and they therefore are not subject to a section 1983 suit. *E.g., Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981). Apparently recognizing as much, plaintiff failed to respond to defendants' motion on the state-action issue.

Defendants' motion regarding section 1983 is granted. There is no count to dismiss, so the remedy is to strike the second paragraph of the Complaint.

### CONCLUSION

Defendants' Motion to Dismiss Second Amended Complaint is granted in part and denied in part. Paragraph two of the Second Amended Complaint is stricken. Defendants Alex Monanteras, Thomas Wides and Paul J. Austgen are dismissed as party defendants. The dismissal as to Monanteras and Wides is on their motion, while the dismissal as to Austgen is on the court's own motion. The Second Amended Complaint survives in all other respects.

---

7. The dismissal of Monanteras and Wides is on their motion. The dismissal of Austgen is on the court's own motion, since he has brought no motion of his own, but plainly is benefitted by the court's holding.