**Melinda ERICKSON, Plaintiff,**

v.

**BOARD OF GOVERNORS OF STATE COLLEGES AND UNIVERSITIES FOR NORTHEASTERN ILLINOIS UNIVERSITY, Defendant.**

No. 95 C 2541.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 18, 1995.

---

Terrance Anthony Norton, IIT–Kent Law Offices, Chicago, IL, for plaintiff.

Mark Thomas Dunn, Dunn, Ulbrich, Hundman, Stanczak & Ogar, Bloomington, IL, Dana D. Deane, Laura Anne Lindner, Ross & Hardies, P.C., Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

Plaintiff Melinda Erickson sued the Board of Governors of State Colleges and Universities for Northeastern Illinois University in a three count complaint, alleging a violation of the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), an amendment to Title VII, in Count I. Count II alleges a violation of the Americans with Disabilities Act. 42 U.S.C. § 12101 *et seq.* Finally, in Count III, Plaintiff alleges an ERISA violation. 29 U.S.C. § 1140. The case is currently before the Court on Defendant's Motion to Dismiss Counts I and II of Plaintiff's Complaint.

### FACTUAL BACKGROUND

Plaintiff was employed at Northeastern Illinois University from November, 1988 through December 17, 1993, when she was terminated. Plaintiff was covered by an employee benefits plan that entitled her to take

ten days of sick leave per year and accrue 1.5 sick days per month with an upper limit of 300 days. From December, 1991 to December, 1993, Plaintiff was required to take sick days in either half-day or full-day increments. During her employment, Plaintiff underwent infertility treatment, using vacation days and sick days, generally in half-day increments. Plaintiff alleges that her supervisor signed her written requests for sick leave, was aware that she was undergoing infertility treatment, and expressed disapproval of her frequent use of sick days. Plaintiff alleges that on May 20, 1993 her supervisor issued "a memorandum reprimanding her for 'tardiness,' evidently in light of Plaintiff's legitimate use of sick leave." (Complaint ¶ 21). On June 17, 1993 Plaintiff received a six month notice of termination, which became effective on December 17, 1993. However, as of June 17, 1993 Plaintiff had not used all of her sick leave and vacation days. On information and belief, Plaintiff alleges that Defendant hired a male to replace her.

### ANALYSIS

■ The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of the complaint. *Adams v. Cavanagh Communities Corp.*, 847 F.Supp. 1390, 1396 (N.D.Ill. 1994). In order to survive a motion to dismiss, a complaint must allege sufficient facts to outline a cause of action. *Davis v. Frapolly*, 747 F.Supp. 451 (N.D.Ill.1989). The complaint "must state either direct or inferential allegations concerning all of the material elements necessary for recovery under the relevant legal theory." *Carl Sandburg Village Condominium Ass'n No. 1 v. First Condominium Dev. Co.*, 758 F.2d 203, 207 (7th Cir.1985).

■ The Court must accept as true all well pleaded factual allegations in the complaint and view them, along with the reasonable inferences to be drawn, in the light most favorable to the plaintiff. *Cornfield v. Consolidated High School District No. 230*, 991 F.2d 1316, 1324 (7th Cir.1993). However, the Court need not accept as true conclusory legal allegations. *Baxter v. Vigo County School Corp.*, 26 F.3d 728, 730 (7th Cir.1994).

A strict standard applies when a court evaluates the legal sufficiency of a plaintiff's factual allegations. A court may grant a motion to dismiss only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Cushing v. City of Chicago*, 3 F.3d 1156, 1159 (7th Cir.1994).

### I. The Motion to Dismiss Count I

■ In Count I, Plaintiff claims that Defendant discriminated against her on the basis of a medical condition related to pregnancy in violation of the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k), an amendment to Title VII. Section 2000e–2 of Title VII provides that "It shall be an unlawful employment practice for an employer to ... discharge any individual because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). In 1978 the PDA, in its entirety, amended the Definitions Section of Title VII such that:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e–2(h) of this title shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: *Provided,* That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

Plaintiff claims that (1) she frequently, but legitimately, used her sick leave in order to receive infertility treatments, (2) her supervisor expressed disapproval of her actions, (3)

on May 20, 1993 her supervisor reprimanded her for "tardiness" due to her legitimate use of sick leave, (4) on June 17, 1993 Defendant gave her a six month notice of her termination, and (5) on December 17, 1993 Defendant terminated Plaintiff. Plaintiff claims that Defendant "was unsympathetic to plaintiff's attempts to become pregnant" and responded by terminating her, thus discriminating against her on the basis of a medical condition related to pregnancy.

Defendant argues for dismissal of Count I on the grounds that "infertility is not a pregnancy-related condition within the meaning of the PDA," and, thus, Count I fails to state a claim upon which relief can be granted. Defendant reasons that the PDA applies only to actual pregnancy, excluding potential pregnancy. Defendant's argument rejects this district's decision in *Pacourek v. Inland Steel Co.*, 858 F.Supp. 1393 (N.D.Ill.1994) (Alesia, J.), where the court also addressed a claim that an employer violated the PDA by terminating a female employee in response to her use of sick leave when undergoing infertility treatment. As in the instant case, the defendant in *Pacourek* argued for dismissal on the grounds that infertility treatment is not a condition covered by the PDA. The court denied the motion to dismiss, holding that (1) the PDA applies to discrimination based upon intended or potential pregnancy in addition to actual pregnancy and (2) infertility is a pregnancy-related condition for purposes of the PDA. *Id.* at 1401–03. The Court agrees with the *Pacourek* holding, which follows from the plain language and legislative history of the PDA, as well as Supreme Court precedent.

Defendant's contention that the PDA does not apply to potential pregnancy is controlled by *International Union, UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 198, 111 S.Ct. 1196, 1203, 113 L.Ed.2d 158 (1991), where the Supreme Court held that a fetal-protection policy which excluded fertile women from certain jobs constituted sex discrimination in violation of Title VII. In support of its conclusion, the Court relied upon the PDA:

"The Pregnancy Discrimination Act has now made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684, 103 S.Ct. 2622, 2631, 77 L.Ed.2d 89 (1983). In its use of the words "capable of bearing children" in the 1982 policy statement as the criterion for exclusion, Johnson Controls explicitly classifies *on the basis of potential for pregnancy. Under the PDA, such a classification must be regarded, for Title VII purposes, in the same light as explicit sex discrimination.*

*Id.* at 199, 111 S.Ct. at 1203 (emphasis added).

The Court went on to assess whether the policy comes within the bona fide occupational qualification ("BFOQ") exception to Title VII. The Court declined to expand the BFOQ exception to allow fetal-protection policies based upon pregnancy or fertility, finding that "such an expansion contradicts not only the language of the BFOQ and the narrowness of its exception, but also the plain language of the PDA." *Id.* at 204. Specifically, the PDA provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes." The Court determined that

[t]his language clearly sets forth Congress' remedy for discrimination on the basis of pregnancy *and potential pregnancy.* Women who are *either pregnant or potentially pregnant* must be treated like others "similar in their ability or inability to work." In other words, women as capable of doing their jobs as their male counterparts may not be forced to choose between having a child and having a job.

*Id.* (quoting the PDA) (emphasis added).

Finally, the Court turned to the legislative history, which rebuts Defendant's assertion that "rather than relate to pregnancy, infertility for a female relates at most to her capacity to become pregnant. To consider infertility as a pregnancy-related condition would expand the protection provided by the PDA beyond its intended scope." (Def.'s Mem. at 4). To the contrary, the Court explained that "the House and Senate Reports accompanying the [PDA] indicate that

this statutory standard was chosen to protect female workers from being treated differently from other employees simply because of their capacity to bear children." *Id.* at 205. Succinctly put, "Congress in the PDA prohibited discrimination on the basis of a woman's ability to become pregnant. We do no more than hold that the PDA means what it says." *Id.* at 211.

Furthermore, Defendant's attempt to distinguish the condition of infertility from fertility for purposes of the PDA is unavailing and, moreover, misses the point. Defendant argues that

> women who are unable to become, or have difficulty becoming pregnant are not the likely targets of pregnancy-based discrimination. As a practical matter, employers that would otherwise deny employment opportunities to pregnant women are less likely to deny such opportunities to women who are unable to become pregnant because they will not have to accept the perceived inconveniences and costs of pregnancy and childbirth.

(Def.'s Reply Mem. at 2–3). As Plaintiff aptly responds, "medical efforts to deal with infertility have no goal other than to achieve pregnancy." (Pl.'s Mem. at 3).

Conversely, Defendant ignores the distinction between male and female infertility when it argues that "unlike pregnancy, infertility is common to both genders" and, thus, an employment practice based upon a female employee's infertility treatment is not sex discrimination (Def.'s Mem. at 3). A male employee's infertility treatment does not seek to achieve his pregnancy; in other words, a male's infertility does not relate to his capacity to become pregnant.

Moreover, the PDA's reach extends far beyond employers' hostility to the costs of pregnancy and childbirth. As the legislative history explains,

Although recent attention has been focused on the coverage of disability benefits programs, the consequences of other discriminatory employment policies on pregnant women and women in general has historically had a persistent and harmful effect upon their careers. Women are still subject to the stereotype that all women are marginal workers. Until a woman passes the child-bearing age, she is viewed by employers as potentially pregnant. Therefore, the elimination of discrimination based on pregnancy in these employment practices in addition to disability and medical benefits will go a long way toward providing equal employment opportunities for women, the goal of Title VII of the civil rights act of 1964.

H.R.Rep. No. 95–948, 95th Cong., 2d Sess. 5, *reprinted in* 1978 U.S.C.C.A.N. 4749, 4754–55.[1] When Plaintiff underwent infertility treatment she too, although infertile, may have been viewed by her employer as potentially pregnant.

Plaintiff alleges that she was discharged because of her potential pregnancy. Like the Supreme Court in *Johnson Controls*, the Court holds that "the PDA means what it says," and, thus, Plaintiff states a claim under the PDA; accordingly, Defendant's Motion to Dismiss Count I is denied.

## II. The Motion to Dismiss Count II

In Count II, Plaintiff relies upon the facts alleged in Count I to state a claim that Defendant discriminated against her on the basis of a disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, which prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees." 42 U.S.C. § 12112(a). The ADA defines disability as

---

1. The expansive breadth of the PDA is further evidenced by its extension to abortion. As the House Report explains, "[b]ecause the bill applies to all situations in which women are 'affected by pregnancy, childbirth, and related medical conditions,' its basic language covers decisions by women who chose to terminate their pregnan- cies. Thus, no employer may, for example, fire or refuse to hire a woman simply because she has exercised her right to have an abortion." *Id.* at 4755. Further, "[i]f a woman suffers complications from an abortion, medical payments and disability or sick leave benefits for the treatment of the complications would be covered." *Id.*

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Plaintiff alleges that Defendant discharged her because of her condition of infertility, a physical impairment that substantially limits the major life activity of reproduction and, thus, constitutes a disability within the meaning of the ADA.

Defendant moves to dismiss Count II, arguing that Plaintiff is not disabled for purposes of the ADA because reproduction is not a major life activity. In so doing, Defendant rejects this district's decision in *Pacourek v. Inland Steel Co.*, 858 F.Supp. 1393 (N.D.Ill.1994) (Alesia, J.), where the court also addressed a claim that an employer violated the ADA by terminating a female employee in response to her use of sick leave when undergoing infertility treatment. In *Pacourek*, the court held that the plaintiff stated a cause of action under the ADA because reproduction constitutes a major life activity. *Id.* at 1404–05. Further, the court in *Doe v. Kohn Nast & Graf, P.C.*, 862 F.Supp. 1310, 1318–21 (E.D.Pa.1994) held that reproduction is a major life activity such that a person infected with HIV is protected by the ADA. *See also Thomas v. Atascadero Unified Sch. Dist.*, 662 F.Supp. 376 (C.D.Cal. 1986) (holding that the Rehabilitation Act applies to a person infected with HIV). The Court agrees with these holdings.

■■■ To fit the ADA definition of disabled, "a person must establish three elements: (1) that (s)he has a physical or mental impairment (2) that substantially limits (3) one or more major life activities." *EEOC Compliance Manual* § 902.1(b) (March 1995).[2] Plaintiff's infertility satisfies all three elements. First, the EEOC instructs that "physical or mental impairment means: (1) any physiological disorder, or condition

... affecting one or more of a number of the following body systems:" including reproductive. 29 C.F.R. § 1630.2(h)(1). Thus, in this case, the first inquiry is an easy one: Plaintiff's infertility is a physiological disorder of the reproductive system. Second, infertility is by definition a substantial limitation of reproduction in that it constitutes the inability to reproduce.

■■■ The parties dispute whether reproduction qualifies as a "major life activity" such that its substantial limitation constitutes a disability for purposes of the ADA. The ADA does not define "major life activity." However, the EEOC Compliance Manual gives "[e]xamples of major life activities ... including caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *EEOC Compliance Manual* § 902 (March 1995); 29 C.F.R. § 1630.2(i). The manual goes on to state that "[o]ther examples of major life activities include sitting, standing, lifting, and mental and emotional processes such as thinking, concentrating, and interacting with others." *EEOC Compliance Manual* § 902 (March 1995). Defendant proffers these two lists as evidence that reproduction is not a major life activity and attempts to distinguish reproduction in three ways.

Defendant offers two false distinctions, first arguing that "while the major life activities identified by the EEOC involve only one person, acting independently, reproduction requires the participation of two individuals." (Def.'s Mem. at 8). However, "interacting with others," listed by the EEOC as a major life activity, explicitly involves more than one person. Further, the argument ignores that almost every activity listed is significant to life precisely because it affects one's involvement with others. Defendant next argues that reproduction is distinguishable as "a very complex process." While it is simply untrue that the other activities are not complex processes, the simplicity or complexity of the process is insignificant.

*Doe v. Kohn Nast & Graf, P.C.*, 862 F.Supp. 1310, 1319 (E.D.Pa.1994) (citing *Thomas Jefferson Univ. v. Shalala*, — U.S. —, —, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994)); *see also School Bd. v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 1127, 94 L.Ed.2d 307 (1987).

---

**2.** The Equal Employment Commission is responsible for enforcing the employment provisions of the ADA. 29 C.F.R. § 1630 app. at 393. "In interpreting a statute, substantial deference is due the interpretation given its provisions by the agency charged with administering that statute."

Finally, Defendant relies upon the reasoning of *Zatarain v. WDSU–Television, Inc.,* 881 F.Supp. 240 (E.D.La.1995), where the court held that infertility does not qualify as a disability under the ADA. The court reasoned that

> Reproduction is not an activity engaged in with the same degree of frequency as the listed activities of walking, seeing, speaking, breathing, learning, and working. *See* 29 C.F.R. § 1630.2(i). A person is required to walk, see, learn, speak, breath [sic], and work throughout the day, day in and day out. However, a person is not called upon to reproduce throughout the day, every day.

*Id.* at 243. The Court disagrees with this reasoning, which appears to view reproduction as the act of conception only, thus ignoring the processes that occur continually in both male and female reproductive systems in order to achieve conception.

The Court also finds support in *McWright v. Alexander,* 982 F.2d 222 (7th Cir.1992), where the Seventh Circuit denied a motion to dismiss an infertile female employee's claim that her employer violated the Rehabilitation Act of 1973, §§ 501, 504, as amended, 29 U.S.C. §§ 791, 794. The plaintiff alleged that when she adopted a child her employer denied her child-care leave that was routinely granted to biological mothers. Significantly, the appendix to the ADA regulations, entitled "Interpretive Guidance on Title I of the Americans with Disabilities Act," instructs that

> The ADA uses the term "disabilities" rather than the term "handicaps" used in the Rehabilitation Act of 1973, 29 U.S.C. 701–796. Substantively, these terms are equivalent. As noted by the House Committee on the Judiciary, "the use of the term 'disabilities' instead of the term 'handicaps' reflects the desire of the Committee to use the most current terminology...."
> ....
> ... Congress adopted the definition of ["disability"] from the Rehabilitation Act definition of the term "individual with handicaps." By so doing, Congress intended that the relevant case law developed under the Rehabilitation Act be generally applicable to the term "disability" as used in the ADA. Senate Report at 21; House Labor Report at 50; Judiciary Report at 27.

29 C.F.R. § 1630 app. at 394–95. Moreover, in discussing the definition of "major life activities" provided in 29 C.F.R. § 1630.2(i), the appendix explains that "[t]his term adopts the definition of the term 'major life activities' found in the regulations implementing section 504 of the Rehabilitation Act at 34 C.F.R. part 104." *Id.* at 395.

In *McWright,* although the parties did not dispute that the plaintiff's infertility constituted a handicap, the court explained that "[t]he regulations define the protected class of handicapped individuals to include any person with a physiological disorder affecting the reproductive system." *Id.* at 226–27 (citing 29 C.F.R. § 1613.702(b)(1)). Although the court did not explicitly analyze the major-life-activity prong of the inquiry, it noted that "[t]he Rehabilitation Act calls for reasonable accommodations that permit handicapped individuals to lead normal lives." *Id.* at 227. Certainly the court's reference to child rearing as part of a "normal life" contemplates the "major-life-activity" prong of the handicapped person inquiry.

Furthermore, in *School Board of Nassau County v. Arline,* 480 U.S. 273, 279–81, 107 S.Ct. 1123, 1127, 94 L.Ed.2d 307 (1987) the Supreme Court analyzed the definitions of physical impairment and major life activities, holding that a teacher with tuberculosis was handicapped within the meaning of the Rehabilitation Act. The Court noted that "although many of the comments on the regulations when first proposed suggested that the definition was unreasonably broad, the Department [of Health and Human Services, which promulgated the definitions,] found that a broad definition, one not limited to so-called 'traditional handicaps,' is inherent in the statutory definition." *Id.* at 280 n. 5, 107 S.Ct. at 1127 n. 5 (quoting 45 C.F.R. § 84 app. A at 310 (1985)). Accordingly, the Court held that the plaintiff's hospitalization due to tuberculosis was "a fact more than sufficient to establish that one or more of her major life activities were substantially limited by her impairment," without engaging in any

more major-life-activity analysis. *Id.* at 281, 107 S.Ct. at 1127.

The Court also finds that Congress intended reproduction to qualify as a major life activity. For example, a House Report on the ADA, in a section entitled "Explanation of Legislation—Definition of the Term Disability," states that "a person infected with the Human Immunodeficiency Virus is covered under the first prong of the definition of the term 'disability' because of a substantial limitation to procreation and intimate sexual relationships." H.R.Rep. No. 101–485 (Part II), 101st Cong., 2d Sess. 52 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 334.

Therefore, the Court holds that Plaintiff's allegation that her infertility is a physical impairment which substantially limits the major life activity of reproduction states a claim under the ADA; accordingly, Defendant's Motion to Dismiss Count II is denied.

## CONCLUSION

For the reasons given in this opinion, Defendant's Motion to Dismiss Count I is DENIED; Defendant's Motion to Dismiss Count II is DENIED.