_____

No. 95-3768
_____

Mary Jo Krauel,                      *
                                     *
          Appellant,                 *
                                     *
     v.                              *
                                     *  Appeal from the United States
Iowa Methodist Medical Center,       *  District Court for the
                                     *  Southern District of Iowa.
          Appellee.                  *
_____      *
                                     *
Equal Employment Advisory            *
Council,                             *
                                     *
          Amicus Curiae.             *

_____

Submitted:  May 13, 1996

Filed:  September 11, 1996
_____

Before BOWMAN, Circuit Judge, HENLEY, Senior Circuit Judge, and WOLLMAN,
     Circuit Judge.

_____

BOWMAN, Circuit Judge.

     Mary Jo Krauel appeals the grant of summary judgment by the District
Court[1] in favor of defendant, Iowa Methodist Medical Center (IMMC), on her
claim of disability discrimination brought under the Americans with
Disabilities Act (ADA), her claim of pregnancy discrimination brought under
the Pregnancy Discrimination Act (PDA), and her claim of sex discrimination
brought under Title VII of the Civil Rights Act.  We affirm.

_____

     [1]The Honorable Ronald E. Longstaff, United States District
Judge for the Southern District of Iowa.

## I.

Krauel has been employed as a respiratory therapist with IMMC since 1979. Throughout her employment, Krauel has participated in IMMC's HealthCare Preferred Plan (the Plan), an employee medical benefits plan regulated by the Employee Retirement Income Security Act (ERISA). The Plan is self-funded in that benefits are paid from IMMC's general assets. As such, the Plan is not subject to state laws that regulate insurance. Since 1990, Plan Exclusion 31 has excluded medical coverage for treatment of male or female infertility problems.

Krauel was diagnosed with endometriosis[2] in 1992. Later that year, Krauel had a laparoscopy, a laser surgery procedure designed to eliminate endometriosis. After attempting to become pregnant naturally for over one year, Krauel visited a fertility clinic where she received artificial insemination and gamete intrafallopian tube transfer (GIFT).[3] Krauel underwent, and paid for, three GIFT treatments, one of which resulted in her pregnancy. In 1994, Krauel gave birth to a baby girl. Pursuant to the Plan's coverage scheme, IMMC paid for Krauel's laparoscopy, pregnancy, and delivery expenses, but IMMC denied coverage for Krauel's fertility treatments under the Plan's exclusion for treatment of infertility problems.

---

[2]Endometriosis is a condition in which the lining of the uterus grows aberrantly in various locations outside the uterus including the fallopian tubes and ovaries. If left untreated, this condition may cause sterility. Richard Sloane, The Sloane-Dorland Annotated Medical-Legal Dictionary 252 (1987).

[3]GIFT is a procedure in which the ova are removed and mixed with sperm in a petri dish. The ova and sperm are then placed in the fallopian tube for natural fertilization. Taber's Cyclopedic Medical Dictionary 774 (Clayton L. Thomas, M.D., ed., 17th ed. 1993).

Krauel brought suit in the District Court, alleging that IMMC's denial of insurance coverage for her fertility treatments violated the ADA, the PDA, and Title VII. Krauel testified in her deposition that her infertility limits her ability to reproduce naturally and to care for others.[4] She also testified, however, that she has not experienced any difficulty caring for herself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working as a result of her alleged disability. She indicated that her infertility has not affected her work performance, attendance, or opportunities for promotion. Krauel did not request special scheduling arrangements or any other accommodation at work because of her infertility.

The District Court granted summary judgment in favor of IMMC, concluding that: (1) Krauel is not an individual with a disability under the ADA because procreation and caring for others are not major life activities; (2) the Plan's infertility treatment exclusion is not a disability-based distinction; (3) the Plan is not a subterfuge to evade the purposes of the ADA within the meaning of § 501(c)(3) of the ADA, codified at 42 U.S.C.

---

[4]When asked to explain through a series of questions in her deposition what she meant by caring for others, Krauel responded,

"Caring for others has do to with caring for--not being able to care for your own children."

"You are unable to have your own children and you're unable to fill that need that I think almost everybody has to raise children."

"Because in the back of your mind, you always want to have your own child to care for. It doesn't affect the way I do my job."

"It affects the way I feel."

Having children of your own "gives you a sense of fulfillment."

Deposition of Mary Jo Krauel at 73-75.

§ 12201(c)(3) (1994); (4) the Plan did not violate the PDA because treatment for infertility is not treatment for pregnancy, childbirth, or a related medical condition; (5) Krauel failed to establish intentional discrimination under Title VII; and (6) Krauel failed to establish a prima facie case of disparate impact under Title VII resulting from the infertility treatment exclusion.  Krauel now appeals, seeking reversal as to all her claims.

## II.

We review <u>de novo</u> the decision to grant a summary judgment motion. <u>Kiemele v. Soo Line R.R.</u>, No. 95-3700, slip op. at 2 (8th Cir. Aug. 20, 1996).  We will affirm the judgment if the record shows there is no genuine issue of material fact and that the prevailing party is entitled to judgment as a matter of law.  <u>Id.</u> at 3; <u>see</u> <u>also</u> Fed. R. Civ. P. 56(c).

## III.

Krauel argues that the District Court improperly granted summary judgment in favor of IMMC on her ADA claim because: (1) she is an individual with a disability; (2) the Plan's infertility exclusion is a disability-based distinction; and (3) the Plan is a subterfuge to evade the purposes of the ADA.  After carefully reviewing the record, we conclude that the District Court properly granted summary judgment in favor of IMMC on the ADA claims.

## A.

Krauel first argues that the District Court improperly determined that she is not an individual with a disability who is protected by the ADA.  Krauel asserts that she has a physical impairment, infertility, that prevents her from becoming pregnant naturally.  She argues that her infertility substantially limits  two major life activities, reproduction and caring for others.

The threshold requirement for coverage under the ADA is that the plaintiff be a "qualified individual with a disability." 42 U.S.C. § 12112(a) (1994). The ADA defines disability as "a physical or mental impairment that substantially limits one or more . . . major life activities." 42 U.S.C. § 12102(2)(A) (1994). Krauel's condition, infertility, prevents her from becoming pregnant naturally. Regulations issued by the EEOC define "physical or mental impairment" as including a disorder of the reproductive system. 29 C.F.R. § 1630.2(h)(1). IMMC does not dispute that Krauel's infertility is a covered physical impairment, instead arguing that, as the District Court concluded, the impairment does not substantially affect a major life activity within the meaning of the ADA.

Because the ADA does not define the term major life activity, we are guided by the definition provided in 29 C.F.R. § 1630.2, the Equal Employment Opportunity Commission (EEOC) regulations issued to implement Title I of the ADA. See 42 U.S.C. § 12116 (1994) (requiring EEOC to issue regulations implementing ADA). As defined in 29 C.F.R. § 1630.2(i), the term major life activity means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."[5] While we recognize that this list is non-exclusive, we note that reproduction and caring for others are not among the examples of listed activities. Although Krauel is unable to conceive without medical intervention, she has the ability to care for herself, perform manual tasks, walk, see, hear, speak, breathe, learn, and work. It is undisputed that her infertility in no way prevented her from performing her full job duties as a respiratory therapist. We conclude, then, that to treat reproduction and caring for others as major life activities under the ADA would be

---

[5]This list is drawn from the regulations issued under the Rehabilitation Act of 1973, the predecessor to the ADA. See 45 C.F.R. § 84.3(j)(2)(ii) (defining major life activities).

inconsistent with the illustrative list of activities in the regulations, and a considerable stretch of federal law. See <u>Zatarain v. WDSU-Television, Inc.</u>, 881 F. Supp. 240, 243 (E.D. La. 1995) (holding that reproduction is not a major life activity under the ADA), <u>aff'd</u>, 79 F.3d 1143 (5th Cir. 1996) (table).

Krauel relies on <u>Pacourek v. Inland Steel Co.</u>, 858 F. Supp. 1393 (N.D. Ill. 1994), to support the proposition that reproduction is a major life activity. We are unpersuaded. The court in <u>Pacourek</u> found that reproduction was a major life activity because the reproductive system was included among the systems that can have an ADA impairment. <u>Id.</u> at 1404; <u>see</u> 29 C.F.R. § 1630.1(h)(1). As the court in <u>Zatarain</u> observed, this argument is flawed because "physical or mental impairment" and "major life activities" are "separate and distinct" components of the ADA's definition of disability. <u>Zatarain</u>, 881 F. Supp. at 243. We hold that the District Court properly concluded that reproduction and caring for others are not cognizable major life activities under the ADA. As the District Court held, Krauel does not have any impairment that substantially limits her in any major life activity that is within the purview of the ADA, and thus she is not an individual with a disability under the ADA.

**B.**

Krauel next argues that even if reproduction and caring for others are not major life activities, summary judgment in favor of IMMC is inappropriate because the Plan is discriminatory on its face. Specifically, she argues that the Plan's exclusion for treatment of infertility is a disability-based distinction. We disagree.

"A term or provision is `disability-based' if it singles out a particular disability (<u>e.g.</u>, deafness, AIDS, schizophrenia), a discrete group of disabilities (<u>e.g.</u>, cancers, muscular

-6-

dystrophies, kidney diseases), or disability in general (e.g., non-coverage of all conditions that substantially limit a major life activity)." EEOC: Interim Enforcement Guidance on Application of ADA to Health Insurance, (June 8, 1993), reprinted in Fair. Empl. Prac. Man. 405:7115, 7118 (BNA). Insurance distinctions that apply equally to all insured employees, that is, to individuals with disabilities and to those who are not disabled, do not discriminate on the basis of disability. Id. at 405:7117.

> For example, a feature of some employer provided health insurance plans is a distinction between the benefits provided for the treatment of physical conditions on the one hand, and the benefits provided for the treatment of "mental/nervous" conditions on the other. Typically, a lower level of benefits is provided for the treatment of mental/nervous conditions than is provided for the treatment of physical conditions. Similarly, some health insurance plans provide fewer benefits for "eye care" than for other physical conditions. Such broad distinctions which apply to the treatment of a multitude of dissimilar conditions and which constrain individuals both with and without disabilities, are not distinctions based on disability. Consequently, although such distinctions may have a greater impact on certain individuals with disabilities, they do not intentionally discriminate on the basis of disability and do not violate the ADA.

Id. at 405:7118 (footnote omitted).

In this case, the Plan's infertility exclusion does not single out a particular group of disabilities, allowing coverage for some individuals with infertility problems, while denying coverage to other individuals with infertility problems. Rather, the Plan's infertility exclusion applies equally to all individuals, in that no one participating in the Plan receives coverage for treatment of infertility problems. For example, the Plan exclusion bars coverage for infertility caused by age, a condition which is not recognized as a disability under the ADA, and for infertility caused by ovarian cancer, which is defined as a disability under

the ADA.  Therefore, the District Court properly held that the Plan is not a disability-based distinction in violation of the ADA.

## C.

Krauel also argues that the District Court erred in holding that the Plan is not being used as a subterfuge to evade the purposes of the ADA within the meaning of § 501(c)(3), the insurance safe harbor provision. In reaching this conclusion, Krauel contends that the District Court incorrectly defined the term subterfuge.  This argument lacks merit.

Section 501(c)(3) states that the requirements of the ADA shall not be construed to prohibit or restrict

> (3) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance.

> Paragraphs (1), (2), and (3) shall not be used as a subterfuge to evade the purposes of subchapter[s] I and III of this chapter.

42 U.S.C. § 12201(c)(3).  To qualify for protection under § 501(c)(3), the Plan's infertility exclusion must (1) be part of a bona fide ERISA medical benefit plan that is not subject to state law, and (2) not be a subterfuge. It is undisputed that IMMC's health plan, which has been communicated to covered employees, is a bona fide plan because it exists and pays benefits. See Public Employees Retirement System v. Betts, 492 U.S. 158, 166 (1989). It also is undisputed that the Plan is not subject to any state law that regulates insurance because it is self-insured and regulated by ERISA.  The only issue, then, is whether the Plan is being used as a subterfuge to evade the purposes of the ADA.

The Supreme Court in <u>Betts</u> held that a benefit plan cannot be a subterfuge unless the employer intended by virtue of the plan to discriminate in a non-fringe-benefit-related[6] aspect of the employment relation. In so doing, the Court struck down an EEOC interpretive regulation that labeled any benefit plan a subterfuge if the plan lacked a cost justification for an age-based differential status. <u>Id.</u> at 175. While the Court in <u>Betts</u> was interpreting subterfuge in the context of the Age Discrimination in Employment Act (ADEA), the same definition of subterfuge is applicable to the use of the term in § 501(c) of the ADA. <u>See</u> <u>Modderno v. King</u>, 82 F.3d 1059, 1065 (D.C. Cir. 1996) (holding <u>Betts</u> definition of subterfuge applies to use of term in § 501 (c) of ADA, reasoning "when Congress chose the term `subterfuge' for the insurance safe harbor of the ADA, it was on full alert as to what the Court understood the word to mean and possessed (obviously) a full grasp of the linguistic devices available to avoid that meaning."). In <u>Modderno</u>, the court of appeals also held that the EEOC's interim guidance on the application of the ADA to health insurance, upon which Krauel relies, was "at odds" with the plain language of the statute and thus not entitled to deference, even assuming that any deference ordinarily would have been due. <u>Id.</u> We agree with the conclusions reached in <u>Modderno</u> and adopt them as our own.

Similarly, we are unpersuaded by the legislative history Krauel offers us, in the form of statements by a few individual members of Congress, on the definition of subterfuge. Congress enacted § 501(c)(3) on July 26, 1990, after the Supreme Court's decision in <u>Betts</u>. <u>See</u> Pub. L. No. 101-336, 104 Stat. 327. Had Congress intended to reject the <u>Betts</u> interpretation of subterfuge when it enacted the ADA, it could have done so expressly by

_____

[6]The EEOC guidelines define fringe benefits as "medical, hospital, accident, life insurance and retirement benefits; profit-sharing and bonus plans; leave; and other terms, conditions, and privileges of employment." 29 C.F.R. § 1604.9.

incorporating language for that purpose into the bill that Congress voted on and the President signed.  We thus decline to employ the proffered legislative history as a basis for rejecting the <u>Betts</u> definition of subterfuge as controlling the meaning of the term in § 501(c).

Applying the <u>Betts</u> definition of subterfuge to the facts in this case, it is undisputed that the fertility treatment exclusion did not adversely affect Krauel's employment in any non-fringe benefit plan context.  Krauel concedes that she has suffered no employment discrimination outside the Plan.  Therefore, the District Court properly concluded that the Plan is not a subterfuge to evade the purposes of the ADA.

**IV.**

Krauel next argues that the District Court improperly granted summary judgment in favor of IMMC on her PDA claim.  Krauel argues that the Plan violates the PDA because infertility is a medical condition related to pregnancy or childbirth.  She contends that a medical condition that causes infertility is related to pregnancy because there is a causal connection between such a condition and pregnancy.  Therefore, the issue before us is whether the District Court properly determined that treatment of infertility is not treatment of a medical condition related to pregnancy or childbirth.

With the enactment of the PDA in 1978, Congress explicitly amended Title VII of the Civil Rights Act of 1964 to provide that discrimination "on the basis of sex" includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k) (1994).  Under general rules of statutory construction, "when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." <u>Norfolk &</u>

W. Ry. v. American Train Dispatchers' Ass'n, 499 U.S. 117, 129 (1991). "Related medical conditions," a general phrase, thus should be understood as referring to conditions related to "pregnancy" and "childbirth," specific terms, unless the context of the PDA dictates otherwise. The plain language of the PDA does not suggest that "related medical conditions" should be extended to apply outside the context of "pregnancy" and "childbirth." Pregnancy and childbirth, which occur after conception, are strikingly different from infertility, which prevents conception. Moreover, the legislative history and the EEOC guidelines do not make any reference to infertility treatments. See Senate Comm. on Labor and Human Resources, 96th Cong., 2d Sess., Legislative History of the Pregnancy Discrimination Act of 1978 (Comm. Print 1980); 29 C.F.R. § 1604.10. Therefore, we hold that the District Court properly concluded that infertility is outside of the PDA's protection because it is not pregnancy, childbirth, or a related medical condition.

The cases that Krauel cites in support of her argument are unavailing. In International Union, UAW v. Johnson Controls, Inc., 499 U.S. 187 (1991), the Supreme Court held that discrimination on the basis of potential pregnancy was discrimination on the basis of sex under Title VII and the PDA. The Court ruled that a company policy that excluded women from jobs involving lead exposure was "not neutral because it does not apply to the reproductive capacity of the company's male employees in the same way as it applies to that of the females." Id. at 199. Potential pregnancy, unlike infertility, is a medical condition that is sex-related because only women can become pregnant. In this case, because the policy of denying insurance benefits for treatment of fertility problems applies to both female and male workers and thus is gender-neutral, Johnson Controls is inapposite.

In Pacourek, the court held that a medical condition that prevents a woman from becoming pregnant "naturally" is a medical

-11-

condition for the purposes of the PDA. 858 F. Supp. at 1403. The conclusions of the court in Pacourek are unpersuasive for two reasons. First, in reaching this conclusion, the court relied heavily on the legislative history of the PDA. This legislative history, however, does not provide any direct evidence that Congress intended infertility to be covered by the PDA. Second, the defendant in Pacourek, unlike the defendant in this case, did not contend (and therefore the court did not decide) that its policy was a gender-neutral one applicable to all infertile workers. We thus find in Pacourek no reason to disturb our holding that the IMMC Plan does not violate the PDA.

## V.

Finally, Krauel argues that the District Court erred in granting summary judgment to IMMC on her Title VII sex-discrimination claims because she (1) presented evidence of intentional sex discrimination; and (2) established a prima facie case of disparate impact. Having reviewed these arguments, we conclude that the District Court properly granted summary judgment in favor of IMMC on Krauel's Title VII claims.

## A.

Krauel argues that IMMC's exclusion of infertility coverage was sex and pregnancy motivated. In support of this argument, Krauel offered statements allegedly made by IMMC vice-president James Skogsbergh. Krauel asserts that Skogsbergh told her that the Plan excluded coverage for infertility treatment coverage because too many women of child-bearing age were employed by IMMC and infertility treatments result in too many multiple births, thereby creating a financial burden on the Plan.

In an intentional discrimination claim, "liability depends on whether the protected trait [under the PDA, pregnancy, childbirth,

-12-

or related medical condition] . . . actually motivated the employer's decision." <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 610 (1993).  In the circumstances of this case, we hold as a matter of law that the alleged statements do not rise to the level of sex discrimination.  If the statements demonstrate anything at all, they may indicate that cost was a factor in IMMC's decision to exclude coverage for infertility treatment.  That is irrelevant, however, unless the fertility treatment exclusion is a sex-based classification.  <u>Cf.</u> <u>Newport News Shipbuilding & Dry Dock Co.</u> <u>v. E.E.O.C.</u>, 462 U.S. 669, 685 n.26 (1983) (noting that, because exclusion of pregnancy coverage is "gender-based discrimination on its face," a cost comparison justification is not a defense); <u>Arizona Governing Comm. v.</u> <u>Norris</u>, 463 U.S. 1073, 1084 n.14 (1983) (Marshall, J., concurring) (noting that the "greater costs of providing retirement benefits for female employees does not justify the use of a sex-based retirement plan").  We already have concluded, earlier in this opinion, that IMMC's fertility treatment exclusion is not a sex-based classification because it applies equally to all individuals, male or female.  Thus Krauel's argument concerning IMMC's consideration of cost is irrelevant, and the District Court did not err in granting summary judgment in favor of IMMC on Krauel's intentional discrimination claim.

**B.**

Krauel contends that IMMC's infertility treatment exclusion disparately impacts female employees in two ways.  First, Krauel argues that infertility treatments have a greater impact on women because, even if the male is the cause of the infertility, women are required, more often than not, to undergo the treatment. Second, Krauel argues that infertility has a greater impact on women because they bear the larger portion of the costs for infertility treatments.  We find these arguments unpersuasive.

-13-

Title VII prohibits employment practices that may be "fair in form" or facially neutral but that are "discriminatory in operation." Connecticut v. Teal, 457 U.S. 440, 446 (1982) (quoting Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971)). To establish a prima facie case of disparate impact, Krauel must show that IMMC uses "`employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another,' without justification." Houghton v. SIPCO, Inc., 38 F.3d 953, 958 (8th Cir. 1994) (quoting International Bhd. of Teamsters v. United States, 431 U.S. 324, 336 n.15 (1977)). The plaintiff must offer "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion" of benefits because the beneficiaries would be women. Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 (1988).

Krauel's first argument fails because she has offered no meaningful statistical evidence showing that female employees were more adversely affected by the Plan's fertility exclusion than male Plan participants. Krauel's second argument is equally unpersuasive because she has offered no statistical evidence showing that female participants in IMMC's medical plan and their dependent spouses incurred a disproportionate amount of the cost of infertility treatments as compared with male Plan participants and their dependent spouses. The fringe benefits received by an employee include those received from the coverage of a dependent spouse. Newport News, 462 U.S. at 682 (providing that the discrimination analysis for employee insurance benefits should include coverage of the dependents of the employees). In this case, the District Court correctly determined there is no evidence of a disproportionately adverse impact on female employees. Therefore, the District Court properly held that Krauel failed to establish a prima facie case of disparate impact.

**VI.**

For the foregoing reasons, the judgment of the District Court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.