**Michelle LAPORTA, Plaintiff,**

v.

**WAL–MART STORES, INC., Defendant.**

**No. 4:00CV50.**

United States District Court, W.D. Michigan, Southern Division.

May 22, 2001.

---

15. The parties are encourage to work out an acceptable rate of interest and an appropriate payment schedule.

John T. Burhans, Burhans Law Offices, St. Joseph, MI, for Plaintiff.

Michael S. Bogren, Plunkett & Cooney, P.C., Kalamazoo, MI, Susan Klooz, Wal-Mart Stores, Inc., Bentonville, AR, for Defendant.

## *OPINION*

SCOVILLE, United States Magistrate Judge.

This is an employment action brought under federal and state disability statutes. Plaintiff, Michelle LaPorta, brings claims under the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101–12213, the Pregnancy Discrimination Act (PDA), 42 U.S.C. § 2000e(k), and the analogous Michigan statutes, the Elliott–Larsen Civil Rights Act, MICHCOMP.LAWS §§ 37.1607–37.2804, and the Persons With Disabilities Civil Rights Act, MICH.COMP.LAWS § 37.1101–37.1607. Plaintiff's claims arise from her termination from employment as a pharmacist by defendant Wal–Mart Stores, Inc. after defendant allegedly failed to accommodate plaintiff's asserted disability of infertility. The matter is now before the court on defendant's motion for summary judgment. The case has been referred to me for all proceedings, including the entry of final judgment, upon the written consent of the parties pursuant to 28 U.S.C. § 636(c). (*See* Consent and Order of Reference, docket # 9).

The court conducted a hearing on defendant's motion on April 25, 2001. For the reasons set forth below, the court concludes that plaintiff has stated a viable claim under the ADA and analogous state law and that genuine issues of material fact preclude entry of judgment as prayed for by defendant. The court further concludes, however, that defendant is entitled to judgment as a matter of law on her claim under the Pregnancy Discrimination Act and Elliott–Larsen Civil Rights Act.

### *Summary Judgment Standard*

As the Sixth Circuit has noted, the federal courts have entered a "new era" in summary judgment practice. *Cox v. Kentucky Dep't of Transp.,* 53 F.3d 146, 150 (6th Cir.1995); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478–81 (6th Cir.1989). While preserving the constitutional right of civil litigants to a trial on meritorious claims, the courts are now vigilant to weed out unsupported claims before trial. Summary judgment is appropriate when the record reveals that there are no issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Parker v. Metropolitan Life Ins. Co.,* 121 F.3d 1006, 1009 (6th Cir.1997) *(en banc); Sable v. General Motors Corp.,* 90 F.3d 171, 175 (6th Cir.1996); *Payne v. Board of Education,* 88 F.3d 392, 397 (6th Cir.1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *See Adcox v. Teledyne, Inc.,* 21 F.3d 1381, 1385 (6th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 251–52, 106 S.Ct. 2505); *see also, EEOC v. United Parcel Serv.,* 249 F.3d 557, 561–63 (6th Cir.2001); *Henderson v. Ardco, Inc.,* 247 F.3d 645, 648–49 (6th Cir.2001).

The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 576, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Wathen v. General Elec. Co.,* 115 F.3d 400, 403 (6th Cir.1997). The party moving for summary judgment bears the initial burden of pointing out to the district court that there is an absence of evidence to support the non-moving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *Moore v. Philip Morris Companies, Inc.,* 8 F.3d 335, 339 (6th Cir.1993). Once defendants show that "there is an absence of evidence to support the nonmoving party's case," plaintiff has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Facts

The following facts, with all inferences and disputed issues resolved in favor of plaintiff as the nonmoving party, are as follows.

Defendant Wal–Mart Stores, Inc. hired plaintiff as a pharmacist at its Benton Harbor, Michigan, store on or about January 20, 1995. Plaintiff was hired to work seventy hours every two weeks, by completing seven ten-hour shifts—four days one week and three days the next. During the time of plaintiff's employment, her direct supervisor was Jeffrey Kauffman, the pharmacy manager at the Benton Harbor store. Tim Lowe was the district manager with authority over a number of Wal–Mart pharmacies, including the Benton Harbor pharmacy.

From the time of her employment until August of 1995, plaintiff worked her assigned seventy-hour bi-weekly schedule. During August of 1995, plaintiff was in-jured in a boating accident and required a reduced work schedule. At plaintiff's request, defendant assigned her to a restricted schedule of forty-two hours (seven six-hour days every two weeks). Plaintiff was paid her full salary, regardless of the reduced schedule, until she used ninety days of paid leave. Thereafter, plaintiff was paid a reduced wage, and she continued on her restricted schedule until the time of her termination. There is evidence that plaintiff's need for a restricted schedule caused some inconvenience and disruption, which was felt especially keenly by Mr. Kauffman, who was often called upon to fill in for plaintiff. There is no evidence, however, that Wal–Mart ever demanded that plaintiff resume her seventy-hour schedule. Furthermore, although Mr. Lowe testified that he spoke with Mr. Kauffman about the possibility of terminating plaintiff's employment because of her inability to work ten hours a day (Lowe Dep. at 87), Mr. Kauffman denied having any such conversation. (Kauffman Dep. at 72–73). Consequently, for purposes of the pending motion, this court must conclude that a jury could find that Wal–Mart supervisors neither warned plaintiff of her need to resume a seventy-hour schedule nor discussed among themselves the possibility of terminating her for her inability to work such a schedule.

During the time that plaintiff was working a restricted schedule, she began pursuing medical treatment for perceived infertility. In February of 1997, plaintiff began a four-month course of treatment of artificial insemination with her gynecologist, Dr. Daniel Lewis. When that process proved unsuccessful, her doctor referred her to Dr. Donald Eward, an expert in reproductive medicine and the treatment of infertility. Dr. Eward began a course of attempted artificial insemination, again without success.

In the spring of 1997, plaintiff advised Mr. Kauffman that she intended to pursue *in vitro* fertilization and that the required procedures would necessitate that she take time off from work. Kauffman advised plaintiff that he would work with her in any way he could to cover the necessary time off. For her part, plaintiff agreed to take vacation time, if necessary, instead of sick leave. Plaintiff began her first cycle of attempted *in vitro* fertilization on August 21, 1997.

The record supports a finding that *in vitro* fertilization is a complicated, expensive, and somewhat dangerous process. It involves the administration of fertility drugs to force the production of multiple mature eggs by the ovaries, instead of a single egg. When the multiple eggs are mature, they are retrieved, either through laparoscopy or by transvaginal aspiration guided by ultrasound. The next step is insemination, which requires the physician to obtain a sperm sample on the day of egg retrieval. Fertilization is then accomplished in a glass dish ("*in vitro*"), and one or more fertilized eggs are transferred to the uterus. The process requires frequent visits to the doctor, especially to avoid a condition called "hyperstimulation," in which the ovaries become swollen. This condition can be life-threatening to the mother because of possible interference with kidney and liver function. The cost of the *in vitro* fertilization process often exceeds $10,000.00.

It is beyond genuine issue that both Kauffman and Lowe were aware that plaintiff was pursuing a course of *in vitro* fertilization and that both agreed to work with plaintiff to the extent that they could. Additionally, plaintiff was purchasing expensive infertility medicine directly from the Wal–Mart pharmacy.

The first attempt at *in vitro* fertilization, begun on August 21, 1997, was unsuccessful, because the fertility drugs did not stimulate the required egg production. Dr. Eward suspended treatments for a time, resuming them in late October of 1997, when plaintiff again began taking medication to stimulate multiple egg production. On Friday, November 7, 1997, Dr. Eward's office informed plaintiff that she was ready for egg retrieval and that she was scheduled for this procedure on the next Monday, November 10, at 9:00 a.m. Plaintiff advised Mr. Kauffman that she needed that day off. Kauffman advised plaintiff that he could not cover her shift on Monday, November 10, as he was already committed to a family vacation. He advised her that she should contact Tim Lowe to determine whether anyone else could work that shift.

Plaintiff telephoned Mr. Lowe and advised him that she needed to take Monday off. Lowe told plaintiff that there was no one available to cover for her and that she must report to work as scheduled. Plaintiff said that she did not intend to report to work and that she would be undergoing the medical procedure that day. Plaintiff was given "ripening" medication the next day (Saturday) at 10:00 p.m., and was therefore required to undergo the harvesting procedure within thirty-four hours. (Dr. Eward Dep. at 11). Plaintiff did not report to work on November 10, and Lowe reassigned a pharmacist from the South Haven store to Benton Harbor in order to cover her shift.

Plaintiff reported to work on Tuesday, November 11, and worked her six-hour shift as scheduled. On Thursday, November 13, 1997, Mr. Lowe called plaintiff and told her to meet him at the store. She met with Lowe and Kelly Cotman, a human resources employee of Wal–Mart. Plaintiff tape-recorded the conversation. During the conversation, Lowe terminated plaintiff's employment, citing her inability

to work ten-hour days and her refusal to show up for work on Monday, November 10. The transcript of the taped conversation (Plf.Ex. 3, attached to docket # 31) shows that Lowe cited both reasons during the conversation.

The November 1997 effort at *in vitro* fertilization was unsuccessful. Plaintiff moved to Florida in March of 1998 and continued fertility treatments through artificial insemination. These efforts were ultimately successful, and plaintiff bore a son in July of 1999.

Plaintiff initiated this civil action in April of 2000, alleging claims under the ADA, the Pregnancy Discrimination Act, and analogous Michigan statutory law. The period for discovery established in the case management order is now closed. Defendant has moved for summary judgment in its favor, challenging plaintiff's ability to meet her burden of proof on essentially every element of each of her claims.

## Discussion

### I. Americans With Disabilities Act

Plaintiff challenges her termination under the Americans With Disabilities Act (ADA). The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). Under the ADA, a disability is defined as:

(A) A physical or mental impairment that substantially limits one or more the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The ADA forbids disability-based discrimination against a qualified individual with a disability in regard to terms and conditions of employment, including discharge. 42 U.S.C. § 12112(a). It further requires employers

to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," unless the employer can demonstrate that the requested accommodation would "impose an undue hardship" on the operation of the business. *Id.* § 12112(b)(5)(A). In the present action, Wal–Mart asserts that plaintiff's infertility was not a disability within the meaning of the ADA, that the infertility did not substantially limit plaintiff in any major life activity, that plaintiff cannot show a failure to grant a reasonable accommodation, and that plaintiff cannot demonstrate that she was discharged for any conduct protected by the ADA. The court will address each contention in turn.

### A. *Existence of Disability*

Plaintiff asserts that she was suffering from infertility, which she alleges qualifies under the definition of "disability" set forth in 42 U.S.C. § 12102(2)(A): a physical or mental impairment that substantially limits one or more major life activities. The Supreme Court has held that consideration of a purported disability under subsection (A) proceeds in three steps. *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). First, the court must consider whether the particular condition (in this case infertility) constitutes a physical impairment. Second, the court must identify the life activity upon which the plaintiff relies and determine whether it constitutes a major life activity within the meaning of the ADA. Third, tying the two statutory phrases together, the court must ask whether the impairment "substantially limited" the major life activity. 424 U.S. at 631, 96 S.Ct. 1062. The court finds that plaintiff prevails at each step of the analysis, for purposes of the pending motion.

Relevant to the first inquiry, whether plaintiff suffers from an impairment, the

EEOC has promulgated regulations defining physical impairments as follows:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, *reproductive*, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine;

29 C.F.R. § 1630.2(h)(1) (emphasis added). In *Bragdon*, the Supreme Court relied upon an identical corresponding regulation under the Rehabilitation Act[1] (45 § C.F.R. 84.3(j)(2)(i)) in holding that an HIV infection constitutes a disability, because it affects the reproductive system. *Bragdon*, 524 U.S. at 637–38, 118 S.Ct. 2196. Certainly, infertility also "affects" the reproductive system. By definition, a woman suffering from infertility has a diminished ability to become pregnant by natural means. An authoritative medical dictionary defines infertility as:

> diminished or absent capacity to produce offspring; the term does not denote complete inability to produce offspring as does *sterility*.

DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 838 (28th ed.1994). Infertility is "the chronic failure of an organ system." *Saks v. Franklin Covey Co.*, 117 F.Supp.2d 318, 326 (S.D.N.Y.2000). The condition falls squarely within the regulation's description of a "physiological disorder, or condition ... affecting [the] reproductive [system]." 29 C.F.R. § 1630.2(h)(1).

Defendant nevertheless asserts that plaintiff has failed to show that she suffers from a disability. Defendant' s opening brief asserted that plaintiff had failed to present medical testimony establishing that her inability to conceive arose from a physiological condition suffered by plaintiff. Defendant suggested that the cause might be a physiological problem of plaintiff's husband or even "environmental factors and lifestyle habits." In response, plaintiff provided the affidavit of Dr. Eward, who stated that he diagnosed plaintiff as having "the medical condition of infertility, which in my medical opinion, prevented her from reproducing without extensive intervention through artificial insemination or *in vitro* fertilization." (docket # 31, Ex. 2, ¶ 4). Defendant's reply brief continues to argue that Dr. Eward's testimony is insufficient, faulting him for not pinpointing the physiological cause of the diagnosis. Defendant's argument is unreasonable. The record discloses that Dr. Eward diagnosed plaintiff as suffering from infertility, and that she thereafter underwent a protracted and expensive effort to avoid the consequences of this condition through artificial insemination and *in vitro* fertilization. A reasonable jury faced with this evidence could certainly conclude that plaintiff suffered from infertility at the time of her termination.

### B. *Major Life Activity*

The second stage of analysis under *Bragdon* is for the court to identify the life activity upon which the plaintiff relies and determine whether it constitutes a "major

---

**1.** The Supreme Court's decision in *Bragdon* recognized that the ADA's definition of disability was drawn "almost verbatim" from the Rehabilitation Act. 524 U.S. at 630, 118 S.Ct. 2196. "Congress' repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing regulatory inter-

pretations." *Id.* It is well established that cases construing the Rehabilitation Act are instructive in construing ADA claims "because the standards under both the acts are largely the same." *See McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 460 (6th Cir.1997).

life activity" within the meaning of the ADA. 524 U.S. at 631, 118 S.Ct. 2196. *Bragdon* itself definitively answered that issue. The *Bragdon* Court held that "[r]eproduction falls well within the phrase 'major life activity.' Reproduction and the sexual dynamics surrounding it are central to the life process itself." 524 U.S. at 638, 118 S.Ct. 2196. In so holding, the Court rejected the contention that Congress intended the ADA only to cover those aspects of a person's life which have a public, economic or daily character. *Id.*

### C.  *Substantial Limitation*

The third step of analysis under *Bragdon* is to ask whether the identified impairment "substantially limited" the major life activity of reproduction. 424 U.S. at 631, 96 S.Ct. 1062. Defendant contends that plaintiff's eventual success in becoming pregnant through artificial insemination in 1998 renders it "impossible" to find that her condition of infertility substantially limited her in the major life activity of reproduction. In so arguing, defendant relies upon three Supreme Court decisions under the ADA: *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999); and *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). Defendant essentially reads this trilogy of cases as holding that a physical condition cannot be deemed a disability under the ADA if it is subject to any ameliorative treatment or measures. Although the federal courts have not established the contours of the principles set forth in this trilogy of Supreme Court cases, it is not likely that their effect is as sweeping as defendant now contends.

At its heart, the *Sutton* trilogy stands for the proposition that the court should not apply *per se* rules in ADA litigation. For example, in *Albertson's*, the Supreme Court disapproved a *per se* Ninth Circuit rule, under which a court need not take into account a person's ability to compensate for monocular vision in determining whether that condition substantially limited a major life activity. 527 U.S. at 565–66, 119 S.Ct. 2162. *Sutton* was to the same effect. In that case, the Court considered the situation of severely myopic plaintiffs who, with the aid of corrective lenses, could function "identically to individuals without similar impairments." In holding that the extent of the impairment must be analyzed in its corrected state, the Court held as follows:

> We conclude that respondent is correct that the approach adopted by the agency guidelines—that persons are to be evaluated in their hypothetical uncorrected state—is an impermissible interpretation of the ADA. Looking at the Act as a whole, it is apparent that if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures—*both positive and negative*—must be taken into account when judging whether that person is "substantially limited" in a major life activity and thus "disabled" under the Act.

527 U.S. at 482, 119 S.Ct. 2139 (emphasis added). The Court reiterated that the question whether a person has a disability under the ADA is an "individualized inquiry." 527 U.S. at 483, 119 S.Ct. 2139; *see Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir.2000) ("Indeed, the Supreme Court in a recent triad of cases has again made clear that such an individualized determination—one which focuses on the medical condition's actual effect on the specific plaintiff—lies at the heart of the ADA.").

The *Sutton* trilogy stands for the proposition that the substantiality of any limitation affecting a major life activity must be judged in light of ameliorative measures and that the effects of those measures, "both positive and negative," must be taken into account. *Sutton*, 527 U.S. at 482, 119 S.Ct. 2139. Unlike the situation in *Sutton or Murphy*, Ms. LaPorta's physical disorder was not rectified by the simple expedient of a pair of eyeglasses or a high-blood-pressure pill. Indeed, neither artificial insemination nor *in vitro* fertilization was designed to cure plaintiff's infertility. Rather, these ameliorative measures were an attempt to accomplish through artificial means the results achieved by normally functioning human bodies. Both courses of treatment are intrusive and expensive. Although the positive effect of these measures was to enhance the probability that plaintiff would conceive a child, the negative effect included the need for frequent medical treatment during working hours.

■ Unlike the plaintiffs in *Sutton* and *Albertson's*, Ms. LaPorta is not asking the court to consider her situation in an uncorrected state. To the contrary, she points to the need for accommodation arising from the corrective measures themselves. Defendant would have the court focus upon the positive effects of the ameliorative treatment (plaintiff ultimately conceived a child) without taking into consideration the negative effects (the need for frequent medical treatment in order to do so). In effect, defendant advocates for a *per se* rule under which a condition that is subject to any amelioration, however onerous, would not qualify under the ADA. Such an approach is directly contrary to the teaching of the Supreme Court. "The Act addresses substantial limitations on major life activities, not utter inabilities." *Bragdon*, 524 U.S. at 644, 118 S.Ct. 2196. On the basis of the evidence now before the court, a jury could find that plaintiff's condition of infertility, even as ameliorated, still substantially limited the major life activity of reproduction at the time Wal-Mart fired her.

### D. *Reasonable Accommodation*

■ The ADA requires covered employers to make reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability, unless the employer bears the burden of showing that the accommodation would impose an undue hardship upon it. 42 U.S.C. § 12112(b)(5)(A). In the present case, plaintiff asserts that Wal-Mart failed to accommodate her need to be absent from work on November 10, 1997, for purposes of infertility treatment. Wal-Mart argues that plaintiff's requested accommodation was not reasonable.

Under the definitional section of the ADA, the term "reasonable accommodation" is defined to include, among other things, "job restructuring" or "part-time or modified work schedules." 42 U.S.C. § 12111(9)(B). Plaintiff's request for time off for purposes of medical treatment certainly falls well within this statutory definition. *See Cehrs v. Northeast Ohio Alzheimer's Center*, 155 F.3d 775, 782 (6th Cir.1998) ("Medical leave as an accommodation is not a novel concept."). Wal-Mart nevertheless argues that plaintiff's request was unreasonable in the circumstances, because plaintiff "ignores the repeated accommodations provided by Wal-Mart both for her back injuries and for doctor's appointments and other procedures related to her efforts to conceive a child." (Def. Brief, docket # 27, at 15). Defendant's argument misperceives the inquiry concerning reasonable accommodation under the ADA. Reasonable accommodation is an element of a *prima facie* case of discrimination under the ADA, 42 U.S.C.

§ 12112(b)(5)(A), and plaintiff thus bears the burden of proof of reasonableness. *See Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1186 (6th Cir.1996). However, a reasonable accommodation is a *"method of accommodation* that is reasonable in the run of cases, whereas the undue hardship inquiry focuses on the hardships imposed by the plaintiff's preferred accommodation in the context of a particular [employer's] operations." *Barth v. Gelb,* 2 F.3d 1180, 1187 (D.C.Cir.1993); *accord Riel v. Electronic Data Sys. Corp.,* 99 F.3d 678, 683 (5th Cir.1996). Put another way, plaintiff's burden at the summary judgment stage is to present facts sufficient to show that her proposed accommodation was "objectively reasonable." *Blanton v. Inco Alloys Int'l,* 123 F.3d 916, 917 (6th Cir.1997) (supplemental opinion). If plaintiff meets this burden, then the burden of proof shifts to the employer to show undue burden in the particular circumstances facing the employer and employee at the time.

The reasonableness of a requested accommodation is a question of fact. *Haschmann v. Time Warner Ent. Co., L.P.,* 151 F.3d 591, 601 (7th Cir.1998). Defendant is entitled to a summary judgment on this issue if no reasonable jury could ever find, on the basis of the undisputed facts, that plaintiff's requested accommodation was reasonable. The undisputed facts, with all inferences drawn in plaintiff's favor, would certainly support a jury finding of reasonableness. Plaintiff kept her supervisors well informed of her course of medical treatment and need for periodic time off from work. Her supervisors were also well aware that she was undergoing *in vitro* fertilization procedures and that she might need time off on short notice. A jury could certainly find that plaintiff's request for a single day off was a reasonable "method of accommodation" even on only one day's notice. The burden would then

be on Wal–Mart to show that the accommodation would have imposed an undue burden upon it, in light of its past accommodations to plaintiff, the alleged lack of a ready substitute pharmacist, and other exigencies facing Wal–Mart.

Nor is Wal–Mart aided by cases such as *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.,* 155 F.3d 775 (6th Cir.1998), and *Cisneros v. Wilson,* 226 F.3d 1113 (10th Cir.2000). Those cases involved employee requests for indefinite leaves of absence, with no fixed date of return. Plaintiff did not ask for an indefinite leave of absence. She merely asked for one day off for medical treatment. Consequently, this is not a case in which the requested accommodation, such as an unlimited leave of absence, is unreasonable on its face. *See Monette,* 90 F.3d at 1187 ("[E]mployers are under no duty to keep employees on unpaid leave indefinitely until such position opens up."). Rather, plaintiff asked for a single day, with the prospect of a future, but finite, maternity leave. The authorities upon which defendant relies are therefore inapposite. *See Haschmann v. Time Warner Ent. Co., L.P.,* 151 F.3d 591, 600–01 (7th Cir.1998) (where employee requested only "short leave of absence," reasonableness thereof was a question of fact for the jury). Where, as here, an employer argues that regular and predictable attendance is a job requirement precluding the granting of medical leave as a reasonable accommodation, the employer bears the burden of persuasion on this issue under the "undue hardship" stage of ADA analysis. *See Cehrs,* 155 F.3d at 782; *see also Reed v. LePage Bakeries, Inc.,* 244 F.3d 254, 257 n. 2 (1st Cir.2001) ("*Ward [v. Mass. Health Research Inst., Inc.,* 209 F.3d 29 (1st Cir.2000) ] is best understood as a case where plaintiff's request for a flexible schedule was facially reasonable, thus requiring the employer to show undue

hardship, an issue on which the employer has the burden.").

Plaintiff has produced sufficient evidence upon which a jury could find that her requested accommodation of a single day off was objectively reasonable. Defendant's arguments concerning the effect of past accommodations, lack of substitute personnel, and the need for predictable attendance all relate to the question of undue burden, upon which defendant bears the burden of persuasion. The evidence on the issue of undue burden is not so one-sided that Wal–Mart must prevail as a matter of law. Consequently, the issues of the reasonableness of the accommodation and the undue burden thereof must be decided by the jury.

### E. *Causation*

In order to establish a claim for wrongful termination under the ADA, plaintiff must establish not only the existence of a disability but also that she is a qualified individual and suffered an adverse employment action "because of" her disability. *McKay v. Toyota Mfg., U.S.A., Inc.*, 110 F.3d 369, 371 (6th Cir.1997). Wal–Mart asserts that plaintiff cannot show that she was terminated because of her alleged infertility. Wal–Mart advances two arguments in this regard. First, Wal–Mart argues that Mr. Lowe terminated plaintiff's employment because of her inability to work a seventy-hour shift. Citing the Sixth Circuit's jurisprudence on mixed-motive cases, Wal–Mart argues that plaintiff thus cannot show that her termination was motivated *solely* by her failure to report for work as directed on November 10, 1997. Alternatively, Wal–Mart argues that plaintiff's termination arose from her conduct (failure to report to work) rather than as a result of a disability.

Wal–Mart is correct in asserting that a plaintiff must establish that she was dis-charged solely on account of a disability. *See Monette*, 90 F.3d at 1177. In the present case, Wal–Mart asserts that its district manager, Timothy Lowe, terminated plaintiff for two reasons, one of which (her inability to work the required seventy-hour shift) was not related to her infertility. Plaintiff has, however, raised a triable issue of fact concerning Lowe's true motivation. It is undisputed that Wal–Mart never demanded that plaintiff resume the seventy-hour work schedule, nor did it ever threaten to fire her on account of her inability to work regular ten-hour shifts. Plaintiff also points to shifting and conflicting reasons proffered by Wal–Mart personnel for plaintiff's firing after the fact. A jury faced with this record could disbelieve Wal–Mart's assertion that plaintiff's inability to work seventy-hour shifts was a real reason for the firing and could determine that Lowe's decision arose solely from plaintiff's absence from work on November 10.

Alternatively, Wal–Mart argues that even if the termination arose solely from plaintiff's failure to appear for work on November 10, this cannot be deemed a violation of the ADA. Defendant relies upon the conduct/disability dichotomy recognized by the Sixth Circuit in cases such as *Maddox v. University of Tennessee*, 62 F.3d 843 (6th Cir.1995). In *Maddox*, plaintiff brought an ADA claim against his employer for dismissing him on the basis of conduct allegedly caused by plaintiff's alcoholism. Plaintiff's argument was that dismissal for alcohol-induced conduct was tantamount to dismissal for alcoholism itself. The Sixth Circuit rejected this argument. The court held that it was proper to focus on "the distinction between discharging someone for unacceptable misconduct and discharging someone because of the disability." 62 F.3d at 847. The court noted that an employer " 'must be

permitted to terminate its employees on account of egregious misconduct, irrespective of whether the employee is handicapped.'" *Id.* (quoting *Little v. FBI*, 1 F.3d 255, 259 (4th Cir.1993)). The Sixth Circuit relied upon the same dichotomy in *Brohm v. J.H. Properties, Inc.*, 149 F.3d 517 (6th Cir.1998), which involved discharge of an anesthesiologist for sleeping during surgical procedures. The anesthesiologist brought an ADA claim, contending that his sleeping was "causally related" to the disability of chronic sleep deprivation secondary to obstructive sleep apnea. Relying upon *Maddox*, the Sixth Circuit upheld the summary judgment, because the plaintiff was terminated for sleeping on the job, not for his disability.

▮ Wal–Mart attempts to invoke the rule of *Maddox* and similar cases, arguing that Ms. LaPorta was fired for her refusal to appear for work on November 10, not on account of a disability. Wal–Mart's argument deforms the holding of *Maddox* beyond recognition. *Maddox* and its progeny merely stand for the proposition that an employer may lawfully discharge an employee for egregious misconduct, even when the misconduct is allegedly induced by a disability. The present case bears no resemblance to *Maddox*. Plaintiff was not fired for egregious misconduct. Rather, Ms. LaPorta asked to be excused from work for a single day as an accommodation

for treatment of her disability. The jury could easily find that her request was reasonable. Wal–Mart refused to accommodate the request and instead terminated her employment for her failure to report to work on the very day for which she sought an excuse. This case is therefore governed by the holding of the Sixth Circuit in *Cehrs*, in which the court rejected a similar defense argument. 155 F.3d at 783–84. The Sixth Circuit specifically relied upon and discussed the First Circuit decision in *Criado v. IBM Corp.*, 145 F.3d 437 (1st Cir.1998), in which the court rejected an assertion by the employer that it fired the employee because of " 'her failure to report to work, rather than because of her disability or the need for an accommodation.'" 155 F.3d at 783. "Asserting that the termination was based on Creado's absenteeism does not justify IBM's action *where the absence was the requested accommodation.*" *Criado*, 145 F.3d at 444 (emphasis added). The discussion by the *Cehrs* court of this issue leaves no doubt that the Sixth Circuit would follow *Criado* on this point. Wal–Mart's refusal to grant an arguably reasonable accommodation by granting plaintiff one day off, followed by its decision to terminate her for her failure to appear for work on that very day falls squarely within the holding of *Cehrs*, in which the court *found the existence of a jury-submissible issue.*[2]

---

**2.** Other appellate courts have found that requests for medical leave within a finite range generally create genuine issues of fact for trial on the question of the reasonableness of the requested accommodation and whether accommodation imposed an undue hardship. *See Garcia–Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 647–48 (1st Cir.2000) (following *Criado*, collecting other appellate cases holding that a medical leave of absence "is reasonable accommodation under the Act in some circumstances," and observing that "[s]ome employees, by the nature of their disability, are unable to provide an absolutely assured time for their return to employment,

but that does not necessarily make a request for leave to a particular date indefinite"); *Nunes v. Wal–Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir.1999) (reversing district court decision granting summary judgment to employer because fact issues existed as to whether medical leave was a reasonable accommodation for employee's syncopal episodes and whether such accommodation would impose an undue hardship on the employer) (citing the Sixth Circuit's decision in *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1080 (6th Cir.1988) on the requirement of a "fact-specific, individualized inquiry");

In conclusion, I find that the evidence is not so one-sided that Wal–Mart must prevail on plaintiff's ADA claim as a matter of law. Defendant's motion for summary judgment on the ADA claim will therefore be denied.[3]

## II. Pregnancy Discrimination Act

Count 3 of the second amended complaint alleges a claim under the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), which forms a part of Title VII of the Civil Rights Act of 1964. The PDA amended Title VII to include within the prohibition against discrimination "on the basis of sex" acts motivated "because of or on the basis of pregnancy, childbirth, or related medical conditions." In its motion for summary judgment, Wal–Mart argues that infertility does not fall within this statutory definition. The court agrees.

The lower federal courts are split on the question whether the PDA covers women undergoing fertility treatment. The question is one of statutory construction: Is infertility a medical condition "related" to pregnancy or childbirth within the meaning of 42 U.S.C. § 2000e(k)? The only federal court of appeals decision to address the issue is *Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674 (8th Cir.1996). In *Krauel*, the Eighth Circuit applied the *ejusdem generis* rule of statutory construction in concluding that the general phrase "related medical conditions" should be understood as referring to conditions related to the specific terms of "pregnancy" and "childbirth." The court observed that nei-

ther the plain language of the PDA nor the legislative history reflected any legislative intent to include infertility (a condition that can affect both men and women) within the ambit of the PDA. Other courts, principally in the Northern District of Illinois, have disagreed. *See, e.g., Erickson v. Board of Governors*, 911 F.Supp. 316 (N.D.Ill.1995), *rev'd on other grounds*, 207 F.3d 945 (7th Cir.2000); *Pacourek v. Inland Steel Co.*, 858 F.Supp. 1393 (N.D.Ill. 1994).

I find that *Krauel* is the more persuasive authority on this issue of statutory construction. Neither the language nor the legislative history of the PDA reflects an intent to cover infertility. Expansion of the statutory definition as plaintiff now suggests creates rather imponderable problems in defining the "protected class" under the PDA. Because claims under the PDA are a subset of Title VII litigation, one core issue is whether the plaintiff was replaced by an individual outside the protected class. *See, e.g., Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 349 (6th Cir. 1997). In the present case, plaintiff was replaced by a woman who ultimately became pregnant and bore a child. For purposes of the present case, is the "protected class" composed of infertile women, so that replacement of an infertile plaintiff with a fertile woman (or even a pregnant woman) violates the Act? This would seem to stand the PDA on its head. If plaintiff's position were accepted, the protected class must certainly include infertile people as well as pregnant women. If so, who would not be

*Rascon v. U.S. West Communications, Inc.*, 143 F.3d 1324, 1333–35 (10th Cir.1998) (upholding district court's finding following a bench trial that four month leave of absence for treatment of post-traumatic stress disorder was a reasonable accommodation and did not impose an undue hardship on the employer).

**3.** The parties do not devote substantive attention to plaintiff's analogous state-law claim under Michigan's Persons With Disabilities

Civil Rights Act. In general, resolution of a claim under the ADA will also resolve a claim brought under this Michigan statute. *See Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 n. 3 (6th Cir.1998) (construing MHCRA which the state renamed in 1998 as the "Persons with Disabilities Civil Rights Act"). Consequently, defendant's motion to dismiss this state-law claim will likewise be denied.

in the protected class? The only rational construction of the statute is the one adopted by the Eighth Circuit in *Krauel*.[4] The court concludes that infertility is not a medical condition related to pregnancy or childbirth within the meaning of the PDA. Wal–Mart's motion for summary judgment on plaintiff's claim under the PDA, and analogous state-law claim under the Elliott–Larsen Civil Rights Act, MICH.COMP. LAWS § 37.1101–37.2804, will therefore be granted.

### Conclusion

Defendant's motion for summary judgment on plaintiff's claims under the ADA and the Michigan Persons with Disabilities Civil Rights Act (counts III and V) will be denied. Defendant's motion for summary judgment on plaintiff's claims under the Pregnancy Discrimination Act and Elliott–Larsen Civil Rights Act (counts IV and VI) will be granted.

---

4. Plaintiff argues that *Krauel* cannot be deemed precedential because its holding under the ADA was thoroughly repudiated by the Supreme Court in *Bragdon*. It is true that *Krauel* is no longer good law on the question whether reproduction is a major life function under the ADA, in light of *Bragdon*. *See* 524 U.S. at 638, 118 S.Ct. 2196. The issue under the PDA, however, is completely distinct, and *Bragdon* does not undermine *Krauel's* precedential effect on the PDA issue.